LAWRENCE J. FREIDERS, Plaintiff-Appellee, *v.* MARTHA DAYTON *et al.,*
Defendants-Appellants.

Second District   No. 77-243

Opinion filed June 29, 1978.

874

Louis E. Neuendorf, of Sandwich, for appellants.

C. Ronald Cook, of Marshall & Marshall, of Somonauk, for appellee.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

The plaintiff Lawrence J. Freiders in count I of his complaint sought to specifically enforce a contract to purchase the home of the defendant Martha Dayton. In count II of the complaint he sought to remove a cloud on title resulting from an interim conveyance from Mrs. Dayton to the defendant Vera Champman Taylor, Mrs. Dayton's sister. The defendants appeal from a judgment in favor of the plaintiff as to both counts.

The contract to convey to plaintiff for the purchase price of $18,000 was executed by Martha Dayton, then age 85, while she was an ambulatory patient in the Roosevelt Square Shelter Care Home in Sandwich, Illinois. The closing was set for June 26, 1973. Prior to that time, however, Mrs. Taylor claimed an interest in the home; and on June 26, 1973, Mrs. Dayton transferred title to the home to Mrs. Taylor and to herself in joint tenancy; admittedly for a nominal consideration and for the purpose of clouding the title.

Attorney Louis Neuendorf represented both defendants. As counsel for Mrs. Dayton he answered count I of the complaint with general denials; and alleged as defenses to the contract: (1) That Mrs. Dayton by reason of advanced age and inability to recall or recollect current or past events was presently incompetent; (2) and for the same reason Mrs. Dayton was also incompetent when she executed the contract; (3) that Mrs. Dayton signed the contract as the result of unconscionable conduct by persons in close association with her; and (4) that Mrs. Dayton could not convey marketable title to the property because it was held in joint tenancy with Mrs. Taylor. Counsel also moved *in limine* to have the court on its own motion appoint a conservator for Mrs. Dayton and to have her declared legally incompetent.

The trial court denied the motions but nonetheless appointed Neuendorf to represent Mrs. Dayton as guardian ad litem. Neuendorf also filed an appearance on behalf of Mrs. Taylor and in an unverified answer to the second count of the complaint Neuendorf neither admitted nor denied plaintiff's allegations.

Pursuant to section 63 of the Civil Practice Act (Ill. Rev. Stat. 1975, ch. 110, par. 63), the questions whether Mrs. Dayton was competent at the time the real estate contract was signed and whether there was undue influence on the part of one Jane Tallent were submitted to the jury for the purpose of advising the trial judge.

Richard J. Johnson testified for the plaintiff that towards the end of April or in early May he saw that Mrs. Dayton's home was vacant and became interested in purchasing it, contacted a real estate agent, Mr. Brady, who referred him to a real estate broker Mrs. Ugland, and that some days later Mrs. Ugland quoted him a price of $17,000 or $18,000; but that he offered between eight and 10 thousand and there was no acceptance.

Mildred Ugland testified that she was not acquainted with Mrs. Dayton, although Mr. Brady was; that as a result of a conversation with Mr. Brady and with Mr. Johnson she went to the shelter care home to speak to Mrs. Dayton. She testified that she saw Mrs. Dayton in her room, and that they had a congenial conversation during which Mrs. Ugland brought out the subject of whether the Dayton home was for sale. The witness testified that Mrs. Dayton answered that she was interested in selling and asked what the house was worth. Mrs. Ugland suggested that she would answer if Mrs. Dayton would trust her with a key so that she and Mr. Brady could make an appraisal; that Mrs. Dayton produced the key from her purse and gave it to Mrs. Ugland; and that after viewing the house Mrs. Ugland went to the nursing home the following day. She first visited with Mrs. Dayton in her room in the presence of a roommate, then at Mrs. Dayton's suggestion that they could talk privately they talked in the dining room. Mrs. Ugland said she told Mrs. Dayton that the appraisal was $17,500 and suggested that the house be marketed for $18,000. She testified she told Mrs. Dayton that possibly they couldn't get that much but that they would try and that Mrs. Dayton answered, "That is fine." Mrs. Ugland produced a listing agreement and said that she read it to Mrs. Dayton, sentence by sentence and asked if she understood after each sentence. She received the answer "Yes." She said if she thought Mrs. Dayton did not fully understand she would reread the sentence and Mrs. Dayton would say "You have said that already." At the conclusion she asked Mrs. Dayton if everything was satisfactory and whether she had any questions, receiving the answer "No, I think everything is alright."

Mrs. Ugland testified that Mrs. Dayton was very alert on both

occasions. She also said that she had had no acquaintance with either the plaintiff or Jane Tallent at the time she secured the listing agreement nor had they ever contacted her. Mrs. Dayton also asked Mrs. Ugland to get the keys to an antique car in the garage as she wanted her "nephew," Dr. Wright, to have it. Later, she said, she was contacted by plaintiff and Jane Tallent, then plaintiff's fiancee, and showed the house to them. An offer to purchase was signed by plaintiff for $18,000. Mrs. Ugland testified that she brought the offer to Mrs. Dayton and in the presence of Jane Tallent who was working at the shelter care home went over it with Mrs. Dayton word for word. She said that Mrs. Dayton expressed great happiness at getting the full $18,000 and said she "Didn't think she would get that much for the home."

Mrs. Ugland further testified that she went back later to talk to Mrs. Dayton about the furniture in the home since it had not been discussed. Mrs. Dayton suggested that it be sold privately piece by piece and not at auction. Plaintiff and Jane Tallent expressed interest in the furniture to Mrs. Ugland and she went back to the home to talk to Mrs. Dayton on three occasions. A price for all of the items was agreed upon in the amount of $2,000.

Mr. Brady testified that he made his appraisal on the basis of his detailed inspection and upon a list of properties from his records of sales which he considered comparable in value. He further testified that Mrs. Dayton had contacted him in early December of 1972 and asked that he bring out an office calendar. When he did she told him that before long she would be unable to continue living in the house and in the spring or summer she was going to sell it.

Marjorie Campbell testified for the plaintiff that she was the administrator of the Roosevelt Square Home from August 1971 to June of 1973. She first met Mrs. Dayton in the summer of 1972 when Mrs. Dayton spoke to her about admission policies. She said Mrs. Dayton was admitted in the fall or possibly in January of 1973. The usual procedure was followed consisting of an interview and a report of a medical examination conducted within three days to determine if the applicant was ambulatory, mentally alert and able to be fairly self-sufficient. She said that Mrs. Dayton returned home in June of 1972 but returned to the home in the winter time with again a medical certificate being furnished. The witness left the home in June of 1973 but she said that while administrator she had talked with Mrs. Dayton many times. She said Mrs. Dayton mentioned selling her house prior to May of 1973, said she was undecided about it but she didn't think she could take care of the house by herself. The witness also testified that Jane Tallent had helped Mrs. Dayton write her checks, pay bills, record her incoming funds and had taken her deposits to the bank but this was all done with Mrs. Dayton's approval

which she would indicate by her initials; and that the help was given because of Mrs. Dayton's physical difficulties.

Rebecca Murray, who was employed at the home, testified to a conversation with Mrs. Dayton prior to May of 1973. She said that Mrs. Dayton worried about selling her home and asked what she should do and, in fact, asked Mrs. Murray to buy it at one time. Mrs. Murray said she did not have the money but she told Jane Tallent about the conversation in April or March of 1973. Mrs. Murray also gave her opinion that Mrs. Dayton was capable of transacting and understanding ordinary business affairs, was alert, and her only serious complaint was that she had arthritis of her feet. She also testified that after May 7, 1973, possibly in the last four weeks before the trial, that she had become more confused. Plaintiff also adduced the testimony of Lester Hage who had been an assistant cashier at the Sandwich State Bank and had known Mrs. Dayton for a long period of time and had further talked to her after she had refused to go through with the contract. He gave the opinion that Mrs. Dayton was very capable of transacting and understanding ordinary business affairs.

Defendants adduced the testimony of Dr. Mattson, a general practitioner, who testified out of the presence of the jury that he examined Mrs. Dayton in the hospital in July of 1974. He diagnosed a myocardial infarction with pulmonary edema. He also said that she had come to his office on various occasions in 1973 and early 1974 mainly for the care of her feet. His records also show a condition of diabetes for the patient. He further said that he examined Mrs. Dayton on March 6, 1975, the evening before he testified and found her to be disoriented, that she had periods of confusion and gave his opinion that she would be unable to assist adequately at the present time in her trial.

Mr. Poole testified on behalf of the defendant. He said that he was a neighbor of Mrs. Dayton and had many visits with her, had taken her to the doctor and had done errands for her. He saw her on May 3 at the shelter care home and she appeared to be "nervous." He said she was able to carry on conversations with him and his wife at that time. He gave his opinion that it would be quite difficult for Mrs. Dayton to "handle her own business, all of it." He based his opinion "on account of her age and her health, both." Mrs. Poole also testified that close to May of 1973 Mrs. Dayton was confused and didn't know whether she wanted to come home or whether she didn't want to come home.

Mrs. Wright, a niece of Mrs. Dayton, testified that Mrs. Dayton stayed with her several days in her home in River Forest. She said Mrs. Dayton had difficulty in speech, slurred her words; that she some times failed to respond to questions or could not remember; that she was indifferent and took little interest. The witness was asked whether Mrs. Dayton comprehended or understood what was going on around her and answered that at some times she did and again no. She said she talked

with Mrs. Dayton on the phone on May 7 and that she was wavering and crying about not wanting to sell and the witness told her not to sign anything. When she saw Mrs. Dayton the next day at the home the latter did not inform her that she had signed the contract. She gave her opinion that Mrs. Dayton was not capable of handling her affairs during April and May of 1973.

Defendants also presented testimony of a realtor who valued the home on May 7, 1973, as being worth $24,500.

Dr. Wright, the husband of Mrs. Dayton's niece also testified in her behalf. He had seen Martha Dayton in the capacity of a doctor as well as a relative since 1942, visiting in her home approximately 3 or 4 times a year, including the year 1973 and seeing her in his home on various visits. He also checked her approximately once a month when she was in the shelter care home. He testified that her stroke had an effect upon her mental capacity resulting in lapse of memory, crying, emotional upsets and slurred speech. He testified that he talked with Mrs. Dayton on May 7 when she had called; that she was emotionally upset and confused, crying and that she had made the statement that they had forced her to "sign her house." He told her not to sign anything and that he would be out the next day and concluded that she was mentally confused when he saw her on May 7 from the fact that anything he suggested she would agree to, whether it was right or wrong. In his opinion she was not capable or able to carry on any "business of life" at that time.

The jury returned interrogatories finding that Mrs. Dayton was competent at the time the contract was signed and that there was no undue influence. At the close of the hearing the trial court entered an order which granted specific performance and also found that Mrs. Taylor held no claim to the property.

Defendants' contention on this record that Mrs. Dayton lacked the capacity to enter into the contract to sell her home is not persuasive. We conclude that the advisory verdict of the jury and the judgment of the trial court on this issue is not against the manifest weight of the evidence.

■▌ It is settled law in Illinois that,

> "* * * although the mind may be impaired by disease incident to old age, still, if the grantor in a deed be capable of transacting ordinary business,—if he understands the nature of the business in which he is engaged and the effect of what he is doing and can exercise his will with reference thereto,—his acts will be valid." *Kelly v. Nusbaum*, 244 Ill. 158, 165 (1910).

■▌ It is undisputed in this case that Mrs. Dayton had recently suffered from a stroke, suffered from lapses of memory, that her speech was slurred, that she was weak and that she suffered some periods of confusion.

However, the record amply supports the trial court's determination that Mrs. Dayton knew the nature and consequences of executing the real estate contract. Even the testimony of Mrs. Wright, Mrs. Dayton's niece, to the effect that Mrs. Dayton understood that when the house was sold she would no longer be able to return to it, indicates that her so-called confusion was an emotional reaction to the sale, but that she knew clearly what she was doing when she executed the contract. Other testimony in the record adduced by the plaintiff which the trier of facts could accept as credible supports the same conclusion.

■■ Defendants also contend that undue influence was exerted upon Mrs. Dayton. It is, of course, true that mental weakness of one party to a transaction, even if it is of itself insufficient to destroy a contract will, if accompanied by undue influence, inadequacy of price, ignorance and want of advice, misrepresentation or concealment be a basis for setting aside the agreement. (See *Fewkes v. Borah*, 376 Ill. 596, 601 (1941).) However, the burden of proof to make a showing of fraud or undue influence in order to set aside a conveyance is normally on the person seeking to make the transfer void (*Klass v. Hallas*, 16 Ill. 2d 161, 165 (1959)) and the undue influence sufficient to render a conveyance inoperative must be of a nature to deprive the grantor of his free will or agency. *Kolze v. Fordtran*, 412 Ill. 461, 470 (1952).

■■ The record does not support the charge of undue influence against Mrs. Ugland who talked to Mrs. Dayton about a possible sale after a prospective purchaser, Richard Johnson, had seen the house vacant and indicated an interest in it. The conduct of Mrs. Ugland shown in the record is not sufficient to prove that she overcame the will of Mrs. Dayton at any time. There was testimony also that Mrs. Dayton deliberated over the sale of the house over a period of time and that she had previously talked about selling it to Mrs. Murray and suggested a price in the $12,000-$15,000 range. The trial court could well conclude that defendants had not sustained their burden of showing undue influence. *Crawford Savings & Loan Association v. Dvorak*, 40 Ill. App. 3d 288, 294 (1976); *In re Estate of Kime*, 42 Ill. App. 3d 505, 510 (1976).

■■ Nor do we find that a confidential relationship was proved between Mrs. Dayton and Jane Tallent Freiders which created a presumption of undue influence. It is true that if a plaintiff can prove by clear and convincing evidence the existence of a fiduciary or confidential relationship the burden shifts to the defendant to show that the transaction was voluntary and without improper influence on his part. (*McFail v. Braden*, 19 Ill. 2d 108, 117 (1960). See also *Guerrieri v. Guerrieri*, 13 Ill. App. 3d 1043, 1045-46 (1973).) The evidence is that the relationship between Mrs. Dayton and Jane Tallent Freiders was amicable and friendly; and that in Miss Tallent's capacity as a social

rehabilitation worker to help the resident's manager in financial affairs she rendered assistance in writing Mrs. Dayton's checks, paying her bills, recording her incoming funds and taking her deposits to the bank, all with Mrs. Dayton's approval. Occasional assistance rendered to an elderly or ailing person does not by itself establish a fiduciary relationship. (*Crawford v. Krebs*, 40 Ill. App. 3d 568, 574 (1976).) The relationship "must result in one party gaining influence and superiority over the other." (*Whewell v. Cox*, 54 Ill. App. 3d 179, 184 (1977).) The relationship between Mrs. Dayton and Jane Tallent Freiders does not suggest such a degree of influence and confidence.

■■■ In addition, it has not been demonstrated that any advantage was taken by Jane Tallent Freiders because of the relationship, which would be a requirement to set the agreement aside on this basis. (See *Perry v. Wyeth*, 25 Ill. 2d 250, 253 (1962); *Durkee v. Franklin Savings Association*, 17 Ill. App. 3d 978, 984 (1974).) The contract stated that Mrs. Dayton would receive $18,000 for the house. Plaintiff introduced an appraiser who valued the property at $17,500 just before the sale based upon seven comparable sales which were placed in the record. While defense counsel produced another appraiser who testified the property should be valued at $24,500, the trial court was free to believe plaintiff's witness. *Crawford Savings & Loan Association v. Dvorak*, 40 Ill. App. 3d 288, 294 (1976); *In re Estate of Kime*, 42 Ill. App. 3d 505, 510 (1976).

It is further clear that the reason for the controversy is not because the purchase price was low but rather because Mrs. Taylor did not approve of the transaction. In fact, Mrs. Wright testified to some conversations at which Mrs. Taylor was present with her and Mrs. Dayton in which Mrs. Dayton was told that the house had been promised to Dr. Wright. The record therefore does not support defense counsel's contention that there was an abuse of a confidential relationship.

■■ Defendants also argue that the trial court erred by granting specific performance because there was an outstanding equitable interest by virtue of the conveyance to Mrs. Taylor. Louis Neuendorf sought to support this theory principally with his testimony. After Mrs. Dayton's husband died in 1954 she conveyed the property to herself and Mrs. Taylor in joint tenancy. The transfer was for testamentary purposes so as to provide for Mrs. Taylor in the event of Mrs. Dayton's death. Also, on February 28, 1970, Mrs. Taylor issued a quit claim deed to Mrs. Dayton for a nominal consideration. The purpose of this transfer was to allow Mrs. Dayton a tax advantage. The trial court sustained plaintiff's objection to this evidence, and it was not heard by the jury but presented as an offer of proof to the court. It is defendants' argument that Mrs. Taylor entrusted her joint interest to Mrs. Dayton when she issued the quit claim deed to her in 1970 and that Mrs. Taylor could have sued for

reconveyance prior to the execution of the real estate contract on the basis of a resulting trust. We do not agree. A resulting trust is created "when land is bought with the money of one person and title is taken in the name of another." (*Suwalski v. Suwalski*, 40 Ill. 2d 492, 495 (1968).) The record, however, does not reveal that Mrs. Taylor ever paid valuable consideration for the joint interest when it was originally conveyed from Mrs. Dayton in joint tenancy. Further, despite the fact that there was evidence that the reconveyance was for tax purposes, there was no evidence that it was intended that a beneficial interest would remain in Mrs. Taylor. See *Fender v. Yagemann*, 29 Ill. 2d 205, 109 (1963).

Nor was there a constructive trust established as defendants argue. The doctrine only comes into operation when "one party holds property which in equity and good conscience should be possessed by another." (*Krebs v. Mini*, 53 Ill. App. 3d 787, 793 (1977).) The record shows that the original conveyance to Mrs. Taylor was made without consideration and in the nature of a testamentary gift; Mrs. Dayton assumed the financial burdens of ownership; and the record does not show any financial contribution on the part of Mrs. Taylor. Under these circumstances it appears that Mrs. Taylor reconveyed to Mrs. Dayton the property which was "equitably and in good conscience" hers all along. It should, of course, be noted that defense counsel does not contend that Mrs. Taylor holds a joint interest by virtue of the June 26, 1973, conveyance which was for the purpose of "clouding title" and at a time when Mrs. Taylor knew that Mrs. Dayton had already contracted to convey the property to Freiders. See Ill. Rev. Stat. 1977, ch. 30, par. 29; *Burnex Oil Co. v. Floyd*, 106 Ill. App. 2d 16, 23-24 (1969).

A major portion of defense counsel's argument both in the trial court and in this court urges that the trial court erred in failing to conduct a competency hearing for Martha Dayton prior to trial. He reasons that if a conservator were appointed on Mrs. Dayton's behalf the testimony of Mrs. Ugland as well as that of Freiders (who testified to his performance of his contractual obligations) and of the witness Brady would have been excluded or limited under the Evidence Act then in effect (Ill. Rev. Stat. 1971, ch. 51, par. 2).

Defendants' counsel filed a motion in the trial court requesting that the court, "on its own motion adjudicate the defendant, Martha Dayton, an incompetent person and appoint a conservator for her." The court denied the motion but did appoint Neuendorf as guardian ad litem for Mrs. Dayton (see Ill. Rev. Stat. 1975, ch. 110, par. 54(3)). There is no record of what if anything transpired at the hearing on the motion so that we cannot review the issues on a factual basis. We assume, however, that the judge ruled as a matter of law that he had no duty to assume the role of a petitioner for the appointment of a conservator. We agree with

this view. The procedure which governs a formal appointment of a conservator is found in sections 11—9 and 11—10 of the Probate Act of 1975 (presently Ill. Rev. Stat. 1977, ch. 110½, pars. 11—9, 11—10; formerly Ill. Rev. Stat. 1975, ch. 3, pars. 11—9, 11—10). Absent an adjudication of incompetence under the appropriate statute and the appointment of a conservator or guardian there is no bar to suit against even an insane person. (See *Kirkland v. Kirkland*, 38 Ill. App. 2d 280, 287 (1962).) The appointment of a guardian ad litem to act as a representative for a party in need of such representation is a procedural not a jurisdictional matter. *Kirkland v. Kirkland*, at 287.

Section 54(3) of the Civil Practice Act provides:

> "If a party is *declared incompetent*, that fact shall be suggested of record and the prosecution or defense shall be maintained by his representative, guardian ad litem or next friend, as may be appropriate." (Emphasis added.) (Ill. Rev. Stat. 1975, ch. 110, par. 54(3).)

However, even under this provision it is not reversible error to fail to appoint a guardian ad litem for one for whom actual incompetence has not been formally so adjudged. (*Curry v. Curry*, 32 Ill.App. 3d 972, 974 (1975)). In *Curry*, the court also noted and we agree that where the petition does not allege "insanity or legal incompetence but only mental and emotional inability to protect her own interest" there is no duty to either appoint a guardian ad litem or conduct a competency hearing. (*Curry v. Curry*, 31 Ill. App. 3d 972, 975 (1975).) *Cowdery v. Northern Trust Co.*, 321 Ill. App. 243 (1944), cited by defendants, does not hold that a court must, upon its own motion, initiate proceedings for the appointment of a conservator pursuant to the suggestion of incompetency. The case deals only with the responsibility of a court to appoint a guardian ad litem (see 321 Ill. App. 243, 254-55). Under the circumstances of this case it follows that although the trial court may not have been required to appoint a guardian ad litem for Martha Dayton under the circumstances it was within its power to do so.[1]

---

[1] The fact that the court appointed Attorney Neuendorf and that Neuendorf accepted the appointment as guardian ad litem, in our view, requires comment. Although Neuendorf stated in oral argument that Mrs. Dayton at no time retained him as counsel in this matter, it is apparent from the record that he did appear for her even though at all times he maintained her incompetence. Initially an obvious question is raised as to the propriety of his participation in the June 26 conveyance placing Mrs. Taylor in joint tenancy in view of counsel's position as to Mrs. Dayton's competency. In Neuendorf's discovery deposition in the record he makes the inadequate explanation that he and Mrs. Taylor didn't really care whether Mrs. Dayton was competent or not, they were principally concerned with at least clouding the title in the event Mrs. Dayton signed a deed in the transaction. Even more disturbing is the fact that Neuendorf by representing both Mrs. Taylor, his principal client, and Mrs. Dayton as guardian ad litem was in the position of representing conflicting interests. Mrs. Taylor claims a joint interest in the real estate which would otherwise be

The evidence in the record, however, does not show that Mrs. Dayton was legally incompetent either at trial or at the time she executed the contract to sell. The trial court therefore properly concluded that the plaintiff was entitled to specific performance and that the later conveyance to Mrs. Dayton and her sister, Mrs. Taylor, in joint tenancy, was in derogation of a contract to sell and should therefore be removed as a cloud on title. The judgment of the trial court is affirmed.

Affirmed.

RECHENMACHER and NASH, JJ., concur.

held solely by Mrs. Dayton. And it should also be noted that Mrs. Dayton has suffered considerable financial loss as the result of the litigation since the court has ordered the plaintiff be awarded his costs and has allowed the deduction of those costs from the purchase price which is due Mrs. Dayton on the home with no appeal from this portion of the order. It is axiomatic that an attorney should not place himself in the position where he may be required to choose between conflicting duties or where he must reconcile conflicting interests rather than protect to the full extent the rights which he should alone represent. *Strong v. International Building & Loan Invest. Union*, 183 Ill. 97, 101 (1899). See also Illinois Code of Professional Responsibility DR-5-105(B).