FIFTH DIVISION

JUNE 9, 2000

1-99-0965

SHELDON A. LUSTIG, d/b/a LUSTIG & ) Appeal from the

ASSOCIATES, ) Circuit Court of

) Cook County.

Plaintiff-Appellee, )

)

v. ) No. 98 M2 399

)

ISAAC HORN a/k/a SAM HORN, ) Honorable

) Consuelo E. Bedoya,

Defendant-Appellant. ) Judge Presiding.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff Sheldon M. Lustig (Lustig), an attorney, brought suit for breach of contract against defendant Isaac Horn (Horn), seeking to recover compensation from Horn for work performed by Lustig and other attorneys in his law firm, Lustig & Associates.  Lustig also sought compensation from Horn for the fees and costs incurred by Lustig and his firm in collecting the money owed Lustig by Horn.  Horn counterclaimed for declaratory judgment, alleging, 
inter alia
, 
that his retainer agreement with Lustig was void.  Following a bench trial, the circuit court awarded Lustig $6,410.03
.  Horn appeals, claiming that the retainer agreement drafted by Lustig was void and unenforceable.

On February 17, 1998, Lustig brought suit, sounding in breach of contract and account stated, alleging that Horn failed to pay for legal services provided by Lustig's firm.  In his complaint, Lustig alleged that Horn had entered into a retainer agreement with his law firm for legal services, that he and his firm had performed their obligations under the contract, and that Horn owed a balance of $21,095.32 in attorney fees.  Lustig also sought "one (1%) percent per month, plus attorneys fees and costs incurred in bringing this suit."  Attached to Lustig's verified complaint was a billing statement and a document entitled, "Retainer Agreement," dated January 19, 1996, and signed by both Lustig and Horn.

The retainer agreement, in pertinent part, stated that Horn "retains and employs" Lustig for representation "with regard to a mortgage foreclosure action."  The retainer agreement further stated in paragraph 3:

"
BILLING
.  Client agrees to pay all statements within ten (10) days after billing, that any statement remaining unpaid more than thirty (30) days will be subject to a one (1%) percent per month late charge and that 
in the event of default in payment Client will pay reasonable attorney's fees and costs incurred in collecting said amount which may be due, whether by suit or arbitration
.  Client authorizes Attorney or his agent to obtain and/or exchange credit reports and information on Client.  Client authorizes Attorney to withdraw from any Client funds in his possession, fees and costs which have been billed to Client.  Any statement not objected to in writing within thirty days from presentment will be deemed accepted and approved by Client."  (Emphasis added.)

In his answer, Horn admitted that he had signed the retainer agreement and further admitted that he had accepted Lustig's legal services.  Nevertheless, he denied that he owed the amount claimed.  Horn also counterclaimed for declaratory judgment, alleging, 
inter alia
, that the retainer agreement provision allowing for interest on unpaid bills, withdrawal of client funds and recovery of costs and fees relating to the collection of unpaid bills effectively "bar[red] a client from ever being able to exercise a right to contest the amount of attorney's fees claimed by the attorney *** without incurring a potential penalty of additional attorney's fees by reason of exercising the client's right to complain that the original amount of attorney's fees claimed by the attorney are unreasonable."  Characterizing the retainer agreement as "oppressive," Horn sought a declaratory judgment that paragraph 3 of the retainer agreement was "void and unenforceable."

The evidence presented at trial revealed that, sometime in early 1996, Horn met with Lustig and asked him for his assistance regarding legal matters.  Horn explained to Lustig that, in 1993 and 1994, he was living at 8034 N. Kenton Avenue in Skokie, Illinois, a building he owned, and was working at the Chicago Mercantile Exchange as a trader.  As a result of an automobile accident in October 1993, Horn took medical leave from his job.  Unable to make the mortgage payments on his home and afraid he would lose it, in July 1994, Horn sold his residence to a local real estate broker, Manijeh Bayzaee, with the agreement that Bayzaee would, after one year, sell the building back to Horn, for which Horn would pay her an additional $25,000.
(footnote: 1)  

As part of his agreement with Bayzaee, Horn continued to live in an apartment in the building, paying Bayzaee rent, while Bayzaee was to pay Horn monthly mortgage payments.  Bayzaee, however, refused to sell back the building to Horn, and she never made any mortgage payments to him.  Horn was unable to make rent payments to her and stopped paying his rent in July 1995.  In September 1995, Bayzaee sought an order of possession and eviction against Horn, which was entered on January 31, 1996.

Horn, shortly thereafter, requested legal representation from Lustig regarding the order of eviction and Bayzaee's default on her mortgage.  At one of their first meetings, Horn's brother-in-law, Alan Israel, also met with Lustig and, because Horn had little money, promised to pay the legal costs.  However, Israel never signed a guarantee and began "backing away" from his initial promise to guarantee Horn's payment of fees.  As a result, Lustig required Horn to execute the retainer agreement.

Lustig's representation of Horn involved several distinct, but related, issues.  First, as a result of Bayzaee's default on the mortgage, Lustig represented Horn in a mortgage foreclosure against Bayzaee.  Second, Lustig undertook an investigation of Bayzaee and her conduct to determine if she had violated any real estate laws.  Third, because Horn indicated that he had never received the earnest money from sale of the building to Bayzaee, Lustig investigated the whereabouts of those missing funds, focusing on Jerome Zelden, Horn's previous attorney.  Finally, Lustig attempted to forestall the eviction proceeding against Horn, who was still living in his apartment in the building. 

According to Lustig, Horn was kept abreast of all the work being done in these cases.  Despite his impoverished circumstances, Horn urged Lustig, and other members of the law firm, to continue their vigorous representation.  As a result of the differing lines of representation and investigation, the legal fees and costs mounted.  For instance, in an attempt to prevent eviction, Lustig filed on behalf of Horn two motions for temporary injunction, one in the eviction case, which was denied, and another in the mortgage foreclosure case, which was also denied.
(footnote: 2)  Horn also asked Lustig to investigate thoroughly any broker misconduct and report it to the proper authorities.
(footnote: 3)  According to Lustig, this "aggressive" approach was undertaken at Horn's urging.

Investigations into the missing earnest money involved "great difficulty" because Horn's previous attorney had died and many documents were missing.  Likewise, the mortgage foreclosure required "extensive" third party discovery to determine the extent of Bayzaee's misconduct, involved numerous court dates and was sharply opposed and unusually contentious.  Ultimately, however, Horn was successful in the mortgage foreclosure, obtaining a judgment of $53,358.40.
(footnote: 4)
Despite Lustig's success in obtaining a judgment for Horn in the foreclosure case, Horn had not been paying his legal bills.  According to Lustig, with the exception of an $18,000 payment, Horn did not pay any bills sent to him by Lustig.  Although Lustig attempted to "maximize" the amount of attorney's fees and costs recovered in the foreclosure case, he nevertheless advised Horn that he "would be responsible directly for all fees and costs that were incurred."  According to Lustig, Horn owed him and his firm $25,223.86 in fees and costs for the foreclosure litigation; $4,261.50 in fees and costs for the eviction case; $2,996.50 in fees and costs for the earnest money investigation; and $1,011.82 in fees and costs for the broker's license investigation.  In all, Lustig claimed $33,493.68 in fees and costs, exclusive of any interest or "collection" fees and costs.
(footnote: 5)
Disputing the legal fees billed by Lustig, Horn claimed that, although he approved of Lustig's actions at the time, he was unaware of the increasing fees and costs.  He further testified that Lustig had promised to limit his fees and costs to the amount of attorney fees awarded by the circuit court in the foreclosure case.  Although Horn stipulated at trial that he had signed the retainer agreement and was not incompetent at the time, he testified that Lustig never explained that document to him and was not present when Horn signed it.  Horn further denied that it was his intention to "go after" Bayzaee's broker's license or to file an injunction in the eviction case; he admitted, however, that he had agreed with Lustig when Lustig explained the courses of action to be taken.

After hearing testimony and reviewing the numerous documents admitted, the circuit court found that the retainer agreement was "unambiguous and clear" and, by failing to pay his bills, Horn had breached that contract.  The court then reviewed and adopted Judge Kinnaird's findings as to Lustig's fees in the foreclosure case, also finding "the fees and costs charged to be excessive and unwarranted."  Nevertheless, after determining that Lustig had performed further necessary and reasonable services for Horn beyond those compensated by Judge Kinnaird, the court awarded Lustig $1,740 in additional fees for later work performed in the mortgage foreclosure litigation.

Finding that the retainer agreement applied only in the foreclosure case, the court, 
sua sponte
, applied principles of 
quantum meruit
 to the eviction representation, the broker's license investigation and the earnest money investigation.  After a review of Lustig's billing statements, the court awarded Lustig $1,040 for work performed on the earnest money investigation; $1,984 for work performed in the eviction case; and $837.70 for costs.  The court further awarded Lustig $400 for "minimal" work done on the broker's license investigation, noting that Horn had not received a benefit from that work, but stating, "this Court wishes to thank Mr. Lustig for bringing to the attention of the State the malfeasance of a real estate broker [and, as] such, therefore, the Court is giving [Lustig] 2.5 hours at $160 an hour for such service."  

The circuit court refused to award interest, but did award Lustig "collection" fees of $4,625 and "collection" costs of $405, incurred as a result of Lustig's attempts to collect the $1,740.00 in additional fees awarded in the mortgage foreclosure litigation.  These "collection" fees and "collection" costs were payable 

pursuant to paragraph 3 of the retainer agreement.  In total, the court awarded fees and costs of $24,410.03; subtracting the $18,000 payment, the court entered a judgment for Lustig in the amount of $6,410.03.  The court also summarily denied Horn's counterclaim.

Horn's principal argument on appeal is that paragraph 3 of the retainer agreement, allowing Lustig to seek additional attorney fees and costs incurred in the collection of Horn's debt, should not be enforced.  In particular, he asserts that paragraph 3 is "void per se" because it is "oppressive, contrary to the Rules of Professional Responsibility and against public policy."  He claims that it "sets up an automatic conflict between the attorney and client," because it contemplates an adversarial proceeding between them.  Horn likewise asserts that this paragraph does not benefit the client, but confers only added, unnecessary rights upon the attorney and also could "be used as a weapon by a lawyer against the client to dissuade the client from contesting the fees sought by the lawyer."  Although Horn does not dispute the fact that Lustig otherwise properly represented him, he takes the position that, because of Lustig's alleged breach of his fiduciary duty, he should not be made to pay any of Lustig's fees.

Lustig counters that the retainer agreement properly allows for the recovery of attorney fees in the event of a breach, likening it to many other business contracts.  See, 
e.g.
, 
Midwest Concrete Products Co. v. La Salle National Bank
, 94 Ill. App. 3d 394, 418 N.E.2d 988 (1981).  Lustig also responds that the record in the instant case reflects no improper conduct on his part which would render his representation of Horn suspect or bar recovery of fees earned. 

A fiduciary relationship exists as a matter of law between an attorney and his or her client and it is incumbent upon the attorney to exercise the utmost good faith and fairness in dealing with the client. 
  
Coughlin v. SeRine
, 154 Ill. App. 3d 510, 515, 507 N.E.2d 505 (1987); 
Durr v. Beatty
, 142 Ill. App. 3d 443, 449, 491 N.E.2d 902 (1986).  Particular attention will be given to contracts made or changed after the relationship of attorney and client has been established.  
Durr
, 142 Ill. App. 3d at 449.  A presumption of undue influence arises when an attorney enters into a transaction with his client during the existence of the fiduciary relationship.  
Franciscan Sisters Health Care Corp. v. Dean
, 95 Ill. 2d 452, 448 N.E.2d 872 (1983).  As a matter of public policy, once raised, a presumption of undue influence must be rebutted by the attorney by "clear and convincing" evidence.  
Franciscan Sisters Health Care Corp.
, 95 Ill. 2d at 464-65.

Here, the evidence presented established that Lustig clearly had undertaken Horn's representation shortly before January 19, 1996, the date they entered into the retainer agreement.  Lustig himself testified, "[a]t some point after we had commenced representation *** I confronted Mr. Horn, told him that without a personal guaranty [from Israel] that I would require him to sign a retainer agreement and to pay the fees as they came due.  He ultimately agreed to that.  We prepared a retainer agreement for Mr. Horn.  I reviewed it with him, he signed it, and we commenced our representation."  Moreover, one of Lustig's billing invoices, dated February 9, 1996, charged Horn for "5.10" hours for work (all occurring on or before January 19, 1996).  According to Lustig's own invoice, on January 14, 1996, he "conference[d] with client at home in evening to discuss case" for one hour, but did not charge Horn for that time.  That same billing invoice reflects that Lustig charged Horn for two hours of the following work performed on January 16, 1996: "Conference with client to discuss case.  Open file. Prepare memorandum outlining case."  The billing invoice also indicated that Lustig billed Horn for ".30" hour on January 18, 1996 for the following work:  "Teleconference with atty (
sic
) Berg who called but pleaded ignorance of facts.  He will contact his client and call tomorrow.  Teleconference with CT&T release dept (
sic
) to put Trust Deed on Hot List."  Lastly, that billing statement reflects that Lustig billed Horn for "1.8" hours of work on January 19, 1996: "Teleconference with CT&T, client and opposing counsel. Prepared correspondence to CT&T advising of loss of note. Prepare correspondence to Alan with guaarnty (
sic
).  Multiple teleconferences with Chicago Title regarding tract search, Minutes of Foreclosure, etc."

The foregoing, in conjunction with Horn's repeated protestations concerning the unfairness of the agreement and regarding Lustig's "oppressive" conduct, was sufficient to raise a presumption of undue influence in this case.  To rebut such an inference, Lustig was required to present some evidence indicating that (1) he made a full and fair disclosure to Horn of all the material facts affecting the transaction and (2) the transaction was fair.  
Durr
, 142 Ill. App. 3d at 450.  Here, there is scant evidence that Lustig explained the details and implications of paragraph 3 to Horn.  Moreover, the content of paragraph 3 cannot be viewed as "fair" to Horn.

An attorney should not place himself in the position where he may be required to choose between conflicting duties or where he must reconcile conflicting interests rather than protect fully the rights of his client.  See 
Frieders v. Dayton
, 61 Ill. App. 3d 873, 883 n.1, 378 N.E.2d 1191 (1978); see also 166 Ill. 2d R. 1.7.  In the instant case, paragraph 3 of the retainer agreement anticipates suit against and recovery of additional fees from a client should that client fail to pay the bill within the time required.  As evidenced from Lustig's conduct, paragraph 3 gives rise to substantial fees for vigorous prosecution of the attorney's own client.
(footnote: 6)  As Horn aptly points out, this provision very well could be used to silence a client's complaint about fees, resulting from the client's fear of his attorney's retaliation for nonpayment of even unreasonable fees.  Such a provision is not necessary to protect the attorney's interests; on the contrary, it merely serves to silence a client should that client protest the amount billed.

Here, such a provision clearly is unfair and potentially violative of the Rules of Professional Conduct barring an attorney from representing a client if such representation may be limited by the attorney's own interests.  See, 
e.g.
, 
In re Marriage of Pagano
, 154 Ill. 2d 174, 607 N.E.2d 1242 (1992); 166 Ill. 2d R. 1.5, 1.6.  Although not every violation of ethical rules will deem an attorney's contract with his client voidable 
per se
, conduct which violates both professional ethics and contract law is not placed beyond the reach of contract law because it violates professional standards.  See 
Maksym v. Loesch
, 937 F.2d 1237, 1244 (7
th
 Cir. 1991).  Accordingly, the circuit court's award of attorney fees and costs incurred in "collection" by Lustig of Horn's unpaid bill is reversed.

Horn also maintains that Lustig's right to recover all other fees earned in representing him, in 
quantum meruit
, is barred by Lustig's improper and unethical conduct.  Although complete denial of attorney fees for legal work tainted by unprofessional conduct may be deemed an appropriate sanction (see, 
e.g.
, 
Licciardi v. Collins
, 180 Ill. App. 3d 1051, 1063, 536 N.E.2d 840 (1989)), such a sanction is not appropriate in the instant case.

The supreme court has exclusive and plenary jurisdiction over attorney disciplinary matters.  
In re Harris
, 93 Ill. 2d 285, 443 N.E.2d 557 (1982).  Courts other than the supreme court may adjudicate matters touching on attorney discipline only when acting as agents of the supreme court upon direct order of that court.  
Ettinger v. Rolewick
, 140 Ill. App. 3d 295, 488 N.E.2d 598 (1986).  Attorney disciplinary proceedings are conducted by Illinois Attorney Registration and Disciplinary Commission (ARDC) and are completely separate from the judicial proceedings in which the alleged attorney misconduct occurred; a denial of attorney Lustig's fees, imposed solely as a sanction for unprofessional conduct on his part, would constitute an impermissible infringement on the exclusive power of the supreme court, acting through the ARDC, to adjudicate disciplinary matters.  See 
Reed Yates Farms, Inc. v. Yates
, 172 Ill. App. 3d 519, 526 N.E.2d 1115 (1988).

An attorney's unprofessional conduct is relevant to the issues involved in both a disciplinary proceeding and in defense of an attorney's suit for collection of fees.  See 
Coughlin
, 154 Ill. App. 3d at 514 ("Both malpractice actions and disciplinary proceedings involve conduct failing to adhere to certain minimum standards and we reject any suggestion that ethical standards are not relevant considerations in each").  Nevertheless, Lustig is entitled to those fees related to proper and necessary work he performed 
for the benefit
 of Horn, barring any unprofessional or unethical conduct during representation.  Any work performed by Lustig "collecting" his own fees from Horn certainly was not for Horn's benefit, and may not be recovered from Horn, notwithstanding the fact that Lustig is entitled to compensation for the other work performed.

Horn stipulated that Lustig and his associates performed all the work stated and that the rates charged were reasonable.  The only dispute at trial involved whether the work performed was "necessary."  The circuit court determined that some of the charges and fees resulting from Horn's representation were "excessive and unwarranted"; accordingly, the court awarded Lustig compensation only for those fees and costs which the court found justified.  The court's determination is entitled to deference and will not be reversed absent an abuse of discretion.  
Tampam, Inc. v. Property Tax Appeal Board
, 208 Ill. App. 3d 127, 566 N.E.2d 905 (1991).  No such abuse is apparent from the instant record.

Finally, Horn raises for the first time in his reply brief the argument that Lustig's "state of mind" is relevant to the issue of the forfeiture of all fees; for support he directs this court's attention to the myriad cases in which Lustig has sued his own clients for nonpayment of fees, revealing a consistent pattern and practice.  Nevertheless, points raised and argued for the first time in a reply brief are waived (177 Ill. 2d R. 341; 
Neri v. J.I. Case Co.
, 207 Ill. App. 3d 409, 413-14, 566 N.E.2d 16 (1991)) and, therefore, will not be considered.

In sum, Lustig's recovery of reasonable fees and costs incurred in the able representation of Horn is allowed.  Lustig's fees and costs incurred in collecting on his bills, however, must be denied in the instant case where such a request is premised upon a void provision of the retainer agreement.  Accordingly, we
 reverse and remand for entry of judgment for Lustig in an amount not including the fees and costs incurred for "collection" of Horn's debt to him.

Reversed and remanded with directions.

THEIS, P.J., and QUINN, J., concur.

FOOTNOTES
1:
Horn's attorney for the sale of the building, Jerome Zelden, was referred to Horn by Bayzaee.  Some improprieties allegedly were committed by Zelden, including not putting in writing the "sell-

back" agreement, not giving Horn the earnest money and keeping the mortgage note.  However, Zelden died sometime after the sale and his alleged improper conduct was never substantiated.

2:
Nevertheless, Horn's eviction was "delayed" for many months and he did not move out of his apartment until June 1996. 

3:
As a result of Lustig's investigation into, and reporting of, Bayzaee's misconduct, her broker's license was suspended and she was fined $5,000.

4:
In the foreclosure case, Lustig filed a motion for attorney fees and attempted to collect fees for some of the peripheral legal work performed for Horn on the other issues, in order "to maximize the award of attorneys' fees under the foreclosure case."  However, Judge Dorothy Kinnaird, ruling in the foreclosure action, denied most of the fees and costs requested, finding them excessive and unrelated to the "straightforward" foreclosure action.  After thoroughly reviewing the fee petition in the foreclosure case, Judge Kinnaird awarded a total of $13,378.33 in attorney fees and costs (which was included in the $53,358.40 judgment amount).

5:
Since the filing of the complaint, Lustig's fees increased because he continued to bill Horn for his services related to the  "collection" of his unpaid fees.  As of January 20, 1998, Lustig was billing Horn for $28,758.98 in fees and expenses.  One of the latest bills sent, dated November 8, 1998, reflected a total due of $48,366.82, of which $18,000 had been paid, leaving a sum due of $30,366.82. This amount included fees and costs of $14,873.14 related solely to the "collection" of Lustig's fees and costs.

6:
Lustig also is demanding from Horn payment of the fees and costs expended in defending the instant appeal.