SANDRA YOUNG, Indiv. and as Adm'r of the Estate of Robert L. Young, Deceased, Plaintiff-Appellee, *v.* G. CERNIAK, M.D., *et al.*, Defendants-Appellants.

First District (5th Division) No. 83—702

Opinion filed August 3, 1984.

Rivkin, Leff, Sherman & Radler, of Chicago (Warren S. Radler, Dale R. Crider, and Hillary Anschel, of counsel), for appellant Wayne M. Kassel.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Daniel J. O'Connor, and Marie A. Monahan, of counsel), for appellant G. Cerniak.

John J. Lowrey and Mary Jo Smerz, both of Law Offices of John J. Lowrey, P.C., of Chicago, for appellee.

JUSTICE SULLIVAN delivered the opinion of the court:

This appeal is from a judgment for plaintiff in a wrongful death action alleging medical malpractice. Cerniak and Kassel (hereinafter defendants)[1] contend that (1) the trial court erred in (a) denying their motions for change of venue, and (b) entering judgment on inconsistent verdicts; (2) the jury was improperly instructed with regard to the appropriate standard of care; and (3) the verdicts against them are contrary to the manifest weight of the evidence.

It is undisputed that plaintiff's decedent, Robert Young (Young), was injured in a fall on January 23, 1975. For several days thereafter, he was treated by Dr. Duffy, an orthopedic surgeon, who diagnosed a sprained wrist and a possible sprained or bruised right knee. However, Young complained of increasingly severe pain in his right calf throughout that period, and was eventually admitted to St. Joseph Hospital, where defendants and Dr. Wastalu, specialists in internal medicine, treated him for deep vein thrombophlebitis. On February 8, 1975, six days after treatment began, Young died as a result of a massive pulmonary embolism. The pertinent issues at trial were whether defendants deviated from the standard of care by failing to administer the proper amount of the anticoagulant Heparin, and by failing to detect symptoms of pulmonary emboli and provide proper treatment therefor, and whether their deviation from the standard of care was the proximate cause of Young's death.

At trial, William Frescura, testifying for plaintiff as an adverse witness, stated that he was chief pharmacist at St. Joseph Hospital and a member of the hospital committee charged with developing the hospital formulary, a list of drugs which had been approved by the medical staff for treatment of patients in the hospital. One of the references used by the committee in generating that listing was the Physician's Desk Reference, a compilation of package inserts provided by drug manufacturers which list usages of the drugs, pertinent warnings, and recommended dosages. Frescura further testified that the formulary set forth a procedure for the administration of Heparin, an anticoagulant which prolongs clotting time and prevents the formation of new clots as well as the extension and embolization of existing

[1]Five other defendants at trial, Drs. Duffy and Wastalu, Orthopedic Surgeons, Inc., Joliet Medical Group, Inc., and the Association of Franciscan Sisters of the Sacred Heart, are not parties to this appeal.

clots. According to the formulary, "Heparin effect is monitored by clotting time determinations," and "[d]osage is that amount of Heparin which maintains the coagulation time at a level two to three times the patient's normal coagulation time." On cross-examination, Frescura agreed that a physician must exercise judgment in determining proper dosage, taking into account patient reaction as well as the manufacturer's recommendations, and that, in the instant case, the physicians' orders for 5,000 units of Heparin to be administered every four hours was within the recommended range of dosage.

Dr. Cerniak, testifying as an adverse witness, stated that he first examined Young on February 3, 1975, the day after his admission to the hospital, and that at that time he displayed the classic symptoms of deep vein thrombophlebitis, which is an inflammatory reaction in blood vessels leading to swelling and the formation of blood clots. Standard treatment for that condition is bed rest, elevation of the leg and application of heat, and administration of an anticoagulant to prevent the formation of further clots. According to Dr. Cerniak, that was the therapy provided in the instant case, and he ordered 5,000 units of the anticoagulant Heparin to be administered by intermittent intravenous injection every four hours, for a total dosage of 30,000 units in 24 hours, and a daily test of clotting time. Dr. Cerniak further stated that one possible complication of thrombophlebitis is pulmonary embolism, which occurs when a blood clot which has formed in the leg becomes dislodged, forming what is termed an embolus, and travels to the lungs. The autopsy on Young revealed that this was the cause of his death, and that report further indicated that there were numerous emboli in his lungs, ranging in age from more than one week old to the very recent, massive embolus which caused his death. However, it was impossible to determine when the clot which became the fatal embolism was formed.

Dr. Cerniak acknowledged that the dosage of Heparin remained the same throughout Young's treatment; that the hospital laboratory form used to report the result of clotting-time tests stated that "therapeutic range should be 30 to 45 seconds," but tests on Young showed clotting time ranging from 16 to 26 seconds, with a control time of 15 to 17 seconds; and that he was aware of the statement in the hospital formulary that "dosage is that amount of Heparin which maintains the coagulation time at a level two to three times the patient's normal coagulation time." He also agreed that the Physician's Desk Reference recommends that the dosage be at this level, and that while that book states as guidelines an initial dose of 10,000 units followed by intermittent injections of 5,000 to 10,000 units every 4 to 6 hours, it

also states that dosage must be adjusted for the individual patient based upon suitable laboratory tests.

Dr. Cerniak also testified that a number of physicians recognized as authorities in the field have advocated the use of tests to determine the anticoagulating effect of Heparin, and the maintenance of coagulation time at two to three times normal, and he acknowledged that this is the most popular approach. However, he noted that a number of other recognized authorities, including those at the Mayo Clinic where he received his training, advocated administration of a fixed dosage, as was given in the instant case, with periodic tests to insure that the dosage was not inordinately high, since a major risk in the use of Heparin is the occurrence of uncontrolled internal bleeding because of the anticoagulating effect of that drug. Many treatises by experts stated that there was no consensus among the medical community with regard to the need for laboratory monitoring of anticoagulant therapy. Dr. Cerniak admitted stating in a deposition that the therapeutic range for Heparin was that amount which achieved a clotting time approximately twice the patient's normal clotting time. Nevertheless, he asserted that an equally acceptable method of treatment was to adjust dosage not only according to test results, but according to clinical observation. In the instant case, he maintained, all clinical signs indicated that Young's condition was improving under the method chosen. His temperature did fluctuate slightly throughout treatment, but that could have been caused by the thrombophlebitis. Otherwise, Young indicated a lessening of pain in his right calf, the swelling had subsided, and his white blood cell count had decreased since admission to the hospital. Moreover, one of the classic symptoms of deep vein thrombosis, referred to as Homan's sign (pain upon stretching the calf muscles), which was present when he first examined Young, had disappeared by the third or fourth day after admission. Finally, the nurses' notes for that time period indicated that Young slept well, was not complaining of pain, and had a good appetite, all signs that he was responding to treatment.

Dr. Cerniak acknowledged that where acute pulmonary embolism is present, the proper dosage for Heparin is approximately 60,000 units per day; however, he stated that Young showed no symptoms of pulmonary embolism. A chest X ray taken at the time he was admitted showed that his lungs were clear, and he did not have any of the common signs of pulmonary embolism; that is, a cough, stabbing pain in the chest, rapid heart rate, and shortness of breath. He admitted that three days after therapy began Young told the nurses that he suffered from weak spells, accompanied by profuse sweating several

times a day, but that complaint was too nonspecific and isolated an event to be a warning of pulmonary embolism. Furthermore, the dull ache in his chest described by Young on admission was not the type of pain associated with pulmonary emboli, which is a severe, incapacitating pain.

Finally, Dr. Cerniak stated that, while Heparin will prevent the formation of new clots or an increase in the size of preexisting clots, it cannot dissolve clots which have already formed, and in his opinion the amount of Heparin administered bears no relation to the embolization of existing clots, although the drug may reduce the possibility of a clot breaking off. Moreover, Heparin is not effective in a certain percentage of cases. In his opinion, the clot which embolized and caused Young's death was formed, at least in part, prior to his admission to the hospital and the commencement of anticoagulant therapy. Dr. Cerniak admitted that the autopsy report indicated that other clots in Young's leg were from 24 hours to 3 weeks old.

Dr. Kassel, testifying as an adverse witness, stated that he examined Young twice during his hospitalization and concurred in the diagnosis. Because Young appeared to be responding well to treatment, he (Kassel) ordered that the dosage of Heparin prescribed by Dr. Cerniak be continued, although he was aware of the hospital formulary which stated that the dosage should be regulated to attain a clotting time two to three times normal, a level which he admitted was never reached during treatment of Young. However, he asserted that Young's improvement under the therapy provided was such that, after four days, application of heat was discontinued and Young was allowed to use the bathroom facilities located adjacent to his bed and to sit in a chair with his leg elevated for one to three hours per day. Dr. Kassel further testified that Young showed no symptoms of pulmonary embolism, but admitted that the weakness, sweating, and increased respiration rate noted by nurses three days after admission might have related to small emboli occurring at that time.

Dr. Joseph Linhart, testifying for plaintiff as an expert in the field of internal medicine, stated that the accepted treatment for deep vein thrombophlebitis as well as pulmonary embolism is bed rest, elevation of the legs, and administration of an anticoagulant. He acknowledged that anticoagulant therapy does not dissolve preexisting clots, but stated that it does help prevent those clots from increasing in size as well as lessen the possibility that they will break off and travel to another area. He explained that it is important to prevent clots from increasing in size because it is generally larger clots which break away, and as long as the clot is growing larger, it is prevented

from becoming firmly attached to the blood vessel through a natural process called organization. Dr. Linhart further testified that it was within the accepted standard of care to begin with an initial dose of 5,000 units of Heparin, although some authorities would advocate giving a larger initial dose where, as here, the patient is larger than average. However, standard practice further required that the clotting time be monitored frequently, and that an attempt be made, through regulation of dosage, to bring clotting time within the range which the hospital and the practicing community established as the therapeutic range, *i.e.*, a safe and effective level of anticoagulation. Here, the hospital had determined that range to be two to three times the normal clotting time, and most hospitals develop their standard based on the usual practice within the community of physicians in the locality.

Dr. Linhart also testified that defendants deviated from the standard of care in failing to order further tests when Young showed symptoms of pulmonary emboli. Had the diagnosis been made, other techniques might have been utilized, such as surgery, which could have prevented Young's death. One possible indication of the presence of pulmonary emboli was the mild enlargement of Young's heart and pulmonary arteries shown in the chest X ray taken upon admission. While this was not conclusive, it should have put defendants on notice to look for other symptoms, such as chest pain, shortness of breath, coughing, dizziness, profuse sweating, and fever. Dr. Linhart admitted that Dr. Cerniak asked Young about these symptoms during his initial examination, and recorded a negative response, but stated that there was no indication in the medical records that any further examination of Young's heart and lungs occurred, since no notations relating thereto were made. Dr. Linhart then testified that further signs of possible pulmonary emboli were present, such as the dull ache described on admission and the weak spells, sweating, and elevated respiration rate noted by nurses on the third day of hospitalization. There was no indication in the chart that these symptoms were properly followed up through further examination and readily-available tests.

On cross-examination, Dr. Linhart admitted that the clinical signs noted in the medical records indicated that Young's condition with regard to the thrombophlebitis in his right calf was improving, and that there are no definitive symptoms of pulmonary embolism. He also acknowledged that there is some controversy over the need to use testing in the treatment of thrombophlebitis with Heparin. However, he asserted that there was a consensus of opinion, since a majority of au-

thorities adhered to the method of treatment which recommended that the dosage be regulated through frequent testing, to maintain clotting time at two to three times normal. That this was the accepted standard within the community was evidenced by the hospital's adoption of that method in its formulary. Furthermore, he asserted, it is not good practice to incorporate new research until such time as a majority has accepted it as a proper method of treatment.

It was stipulated that a statement of procedure for administering or testing Heparin used by the laboratory at St. Joseph Hospital in 1975 provided:

> "Intervenous Heparin Therapy, total adult dose of 30,000 units is required daily. To prevent excessive bleeding, an assay of Heparin activity should be obtained prior to the next intervenous dose. If the thrombin time is prolonged, the Heparin dose should be reduced."

Dr. Cerniak, testifying on his own behalf, added to his earlier statements that it is not acceptable practice to merely follow the recommendations set forth in the Physician's Desk Reference without regard to any other information available. The internist must take into account, in addition, the statements of the patient, the results of physical examination, nursing notes, and laboratory data. In this case, all available information showed a pattern of daily improvement, indicating that the Heparin was producing the desired effect. Dr. Cerniak also testified that the enlargements shown in Young's chest X ray were not conclusively indicative of the presence of pulmonary emboli, and that he did inquire about other symptoms but Young stated that he did not have any stabbing chest pain, shortness of breath, weak spells or fainting, which might have been indicative of pulmonary emboli.

Dr. Kassel, testifying in his own behalf, stated that each time he examined Young he listened to his heart and lungs, which were normal, and that no notations thereof appear in the chart because it is not usual practice to record negative findings unless they are significant to treatment. Dr. Kassel further testified that he questioned Young regarding the weak spells reported by the nurses, and Young indicated that he had only one serious episode, which had occurred at approximately noon the previous day, but stated that there had been no recurrence. He (Kassel) did not find this isolated incident significant, but advised Young to report any further spells. The medical records did not indicate that there was any recurrence, and Dr. Kassel asserted that it was extremely unlikely that a vague, one-time episode such as the one described would have been caused by pulmonary em-

boli.

Dr. Buckingham, a specialist in internal medicine testifying for defendants, stated that the dosage of Heparin administered to Young was appropriate, and the treatment provided met accepted standards of care within the practice of internal medicine. He also stated that the manufacturer's recommendations set forth in the Physician's Desk Reference were only a guideline, and deviation therefrom was appropriate where required by a patient's individual needs. If a patient showed improvement, as did Young, that was the best indication that the drug was having the desired effect. Dr. Buckingham also testified that pulmonary embolus is very difficult to diagnose, and there was nothing in the medical records which would have alerted the treating physicians to the fact that embolization was occurring. The chest X ray taken on admission was not indicative of any particular problem, and the medical records showed that Dr. Cerniak did follow up on the mild enlargement shown in the X ray by seeking information on possible additional symptoms, and received negative responses from the patient. On cross-examination, Dr. Buckingham admitted stating in a deposition that generally the therapeutic range for Heparin is that dosage which elevates the clotting time to 2 or 2½ times the control level. He also agreed that it was possible that some emboli occurred at the time Young complained of weakness and sweating.

Dr. Rosenbaum, also testifying as an expert witness, said that there was nothing in Young's medical records which would have indicated impending pulmonary embolus. He acknowledged, however, that the presence of fever and weak spells required further examination, but stressed that those symptoms were not necessarily indicative of any specific problem.

Finally, defendants presented the evidence deposition of Dr. Stanford Wessler, who testified as an expert in the field of peripheral vascular diseases. He stated therein that the treatment provided in the instant case was consistent with good medical practice. Dr. Wessler also noted that there was a considerable amount of controversy in the field with regard to proper dosage. Many internists, possibly the majority, did advocate using periodic tests in order to regulate dosage and achieve a clotting time within a certain range, usually two to three times normal. However, he stated that this method was not universally accepted and, in his opinion, such tests were of no value. In 1975, a number of experts advocated, as did he, the use of a fixed dosage, without laboratory monitoring, as was followed in the instant case. Dr. Wessler acknowledged that he had changed his position with regard to the proper dosage of Heparin, and that at one time he did

advocate adjusting it to achieve a certain level of anticoagulation. He also testified that while Heparin reduces the incidence of embolization of preexisting clots, in 10 to 20% of cases emboli will occur despite the proper use of Heparin.

At the close of plaintiff's evidence, the trial court directed verdicts for two defendants—Dr. Duffy (the orthopedic surgeon) and the corporation which owned and operated St. Joseph Hospital. At the close of all the evidence, the jury returned verdicts for plaintiff against defendants herein, and against plaintiff as to a third internist, Dr. Wastalu, and Joliet Medical Group, Ltd., the professional·corporation of which defendants and Dr. Wastalu were shareholders and employees. This appeal followed.

OPINION

Defendants first contend that the trial court erred in denying their motions for change of venue. Therefore, a brief procedural history is necessary to the consideration of their arguments. This action was originally filed in Will County, naming as defendants Dr. Duffy and his professional corporation, Orthopedic Surgeons, Ltd., Drs. Kassel, Cerniak and Wastalu and their medical corporation, Joliet Medical Group, Ltd., and St. Joseph Hospital. The case remained pending for three years in Will County before plaintiff voluntarily dismissed that action and filed the present action in Cook County on December 30, 1980, pursuant to section 24 of the Limitations Act (Ill. Rev. Stat. 1979, ch. 83, par. 24a, now codified at Ill. Rev. Stat. 1983, ch. 110, par. 13—217). The current action is identical to that filed in Will County, except that plaintiff substituted as a defendant, in lieu of St. Joseph Hospital, "an Association of Franciscan Sisters of the Sacred Heart, a corporation, individually and doing business as St. Joseph Hospital" (the Association). Venue in Cook County was predicated upon the residence here of the Association, and it is undisputed that, as to the other defendants, venue would be proper only in Will County, and that all of the events giving rise to the cause of action occurred in Will County. Two motions for change of venue were filed prior to trial. The first alleged that venue in Cook County was improper because "all *** Defendants are located or practice in Will County" and the cause of action arose in Will County. No mention was made therein of the Association's dual residency for purposes of venue, nor was there any allegation that the Association was joined in bad faith for the sole purpose of fixing venue in Cook County. The second motion was predicated upon the doctrine of *forum non conveniens*. Both motions were denied, and the action proceeded to trial.

At the close of plaintiff's case, when the trial court directed a verdict for the Association, the remaining defendants again moved for change of venue, asserting that the Association was joined in bad faith for the sole purpose of fixing venue in Cook County. That motion was also denied, and it does not appear from the record that the motion was renewed at the close of all the evidence.

Defendants first argue that their motions should have been granted because the record establishes that the Association was joined for the sole purpose of fixing venue in Cook County. They maintain that the lack of good faith in naming the Association is shown by the direction of a verdict in its favor; by plaintiff's failure to introduce any expert testimony against the Association; and by the affirmative statement of plaintiff's expert witness that the hospital and nursing staff were not negligent.

■ Initially, it is our view that this issue has not been preserved for review. Section 2—105 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—105) provides:

> "In any action involving defendants residing in different counties in which venue is based on residence and an appropriate and timely motion to transfer is made by a defendant not residing in the county, the overruling of the motion is not ground for reversal if he or she proceeds to trial on the merits, unless he or she renews the motion at the close of all the evidence and it appears from the record or the evidence that the defendant residing within the county was joined without probable cause and not in good faith for the purpose of obtaining a judgment against him or her but solely for the purpose of fixing venue in that county."

Recently, in *Novak v. Thies* (1980), 89 Ill. App. 3d 991, 412 N.E.2d 666, we found the above statute applicable under circumstances similar to the facts of the instant case. There, no motion for change of venue was made prior to trial, but the record established that the cause of action did not arise in Cook County, and only one of the three defendants was a resident of the county for purpose of the venue statute. At the close of the plaintiff's evidence, the trial court directed a verdict for the defendant whose residence served as the basis for venue, and the remaining defendants moved to transfer the case to Du Page or Kane County, alleging that the resident defendant was not joined in good faith, but solely for the purpose of fixing venue in Cook County. That motion was denied, and the trial proceeded, resulting in a judgment for the plaintiffs. We held that because, as here, the defendants failed to renew their motion at the

close of all the evidence, the trial court's ruling was not grounds for reversal.

■ Moreover, we believe that the trial court did not err in denying the motion on its merits. It appears that plaintiff's allegations against the Association were based on *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, wherein the supreme court held that a hospital may be held liable in negligence if its nursing staff fails to recognize symptoms indicating that a dangerous condition is developing, or fails to bring that condition to the attention of the attending physician or hospital authorities. Here, plaintiff testified that although her husband's condition improved during the first two days of treatment, it rapidly deteriorated thereafter, and on the night before he died he was extremely weak, sweating profusely, and complaining of severe pain in his right leg and groin. She also stated that the nurses were aware of his condition, although no record thereof appears in the nursing notes for that period. Plaintiff also presented evidence that the nursing staff was aware of the hospital formulary regarding the proper dosage of Heparin, and that hospital policy required the nursing staff to bring mistakes in medication orders to the attention of the attending physician and to report to the hospital administration any questionable orders pertaining to patient care or treatment. In the light of this evidence and the *Darling* decision, we cannot say that plaintiff lacked probable cause for joining the Association as a defendant.

We also note that the failure to produce evidence against a defendant, and the fact that a verdict has been directed for that defendant, are not dispositive on the issue of lack of good faith. (*Novak v. Thies* (1980), 89 Ill. App. 3d 991, 412 N.E.2d 666.) In *Novak*, we noted as contraindications of bad faith the fact that the defendant for whom the verdict was directed had not filed a motion for summary judgment, nor had it sought costs and attorney fees, pursuant to section 2—611 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—611), relating to sanctions for untrue allegations made without probable cause. Here, too, no such motions were made, and we are further pursuaded by the fact that the Association did not move for dismissal for failure to state a cause of action. Additionally, it appears that the hospital was named in the original action filed in Will County—further indication that it was not joined for the sole purpose of fixing venue in Cook County. For these reasons, we believe that the trial court properly rejected defendants' claim that the Association was named without probable cause and for the sole purpose of fixing venue.

■ Defendants further maintain that the trial court erred in denying their motion to transfer venue on the basis of *forum non conveniens*, pointing out the similarity between the facts of the instant case and *Torres v. Walsh* (1983), 98 Ill. 2d 338, 456 N.E.2d 601. There, the events giving rise to the cause of action occurred in Sangamon County, and all of the defendants were residents of Sangamon County, while the plaintiffs were residents of Texas. However, one of the defendants—the corporate owner of a hospital where the plaintiff was treated—had a registered agent in Cook County, making it a resident of this county for purposes of venue. (Ill. Rev. Stat. 1981, ch. 110, par. 2—102.) The supreme court held that the doctrine of *forum non conveniens* was applicable to the intrastate transfer of cases, and denied the plaintiffs' request for writ of *mandamus* to compel the Cook County trial court to vacate its order transferring the action to Sangamon County.

Here, as in *Torres*, the events giving rise to the cause of action occurred in Will County, and all defendants, as well as plaintiff, are residents of Will County. Furthermore, although one of the corporate defendants was also a resident of Cook County, its activities within this county which made venue proper were totally unrelated to any issue in the suit. Of course, the court in *Torres* considered more than the residency of the parties in determining that Cook County was not a convenient forum; however, we need not reach these other factors, since we believe that a further statement of the supreme court in *Torres* is dispositive of the issue. In modifying its decision on denial of a petition for rehearing, the court stated:

> "In conclusion, since this is the first pronouncement of this court allowing the intra-state application of the doctrine of *forum non conveniens*, we believe it is only equitable that we apply our holding *** to all cases filed on or after September 16, 1983, the date on which the [opinion] in this case *** [was] filed." (98 Ill. 2d 338, 353, 456 N.E.2d 601, 608.)

Because the instant action was filed long before September 16, 1983, we are constrained to hold that denial of defendants' motion for change of venue predicated upon the doctrine of *forum non conveniens* is not grounds for reversal.

Defendants next contend that the judgment against them must be reversed because the jury returned a verdict for Joliet Medical Group, Ltd. (Joliet Medical)—the professional corporation of which they were shareholders and employees. They posit that, since the only theory of liability alleged against Joliet Medical was derivative, based on the doctrine of *respondeat superior*, then, as a matter of law, they may

not be held liable where the master or principal has been found not liable. In support of their position, they cite a number of cases which hold that where an action is brought against two defendants, and one of them may be found liable only on the basis of *respondeat superior* for the negligence of the other, a judgment on the merits for one of the defendants is, in legal effect, a judgment for the other (see, *e.g., Towns v. Yellow Cab Co.* (1978), 73 Ill. 2d 113, 382 N.E.2d 1217), and where the jury returns inconsistent verdicts finding for one of the defendants but against the other, the verdict finding one of the defendants liable must be reversed as legally inconsistent (*Rakus v. Black* (1965), 55 Ill. App. 2d 438, 204 N.E.2d 611).

■ We agree that the above-cited cases accurately state the general principles of the doctrine of *respondeat superior*. However, in the instant case we are presented with a unique set of circumstances. In her complaint, plaintiff did not allege any individual acts of negligence on the part of Joliet Medical, but sought to hold it liable solely on the basis of *respondeat superior*, and it was admitted in defendant's answer to these allegations that they were acting as agents of Joliet Medical in treating defendant. It was therefore not necessary that any evidence be presented as to agency—and none was—other than to establish that the individual defendants were employed by Joliet Medical. The jury thus should have been instructed that if it found one of the individual defendants liable, it was required to find Joliet Medical liable; but if it found all of the individual defendants not liable, it was required to find Joliet Medical not liable. Illinois Pattern Jury Instruction (IPI), Civil, No. 50.01 (2d ed. 1971).

However, no such instruction was given; instead, despite the fact that no independent acts of negligence were alleged against Joliet Medical and no evidence thereof was presented, the case went to the jury on the theory of individual liability only. At defendants' request, IPI Civil No. 41.03 was given, which states:

"Although there is more than one defendant in this action, it does not follow from that fact that if one is liable, all are liable. Each is entitled to a fair consideration of his own defense and is not to be prejudiced by the fact, if it should become a fact, that you find against the others. The instructions govern the case as to each defendant, insofar as they are applicable to him, to the same effect as if he were the only defendant in the action, and regardless of whether reference is made to defendant or defendants, in the singular or plural form. You will decide each defendant's case separately as if each were a separate lawsuit."

In addition, the verdict forms submitted to the jury allowed it to return separate verdicts as to each of the defendants, including Joliet Medical. Of course, the above instruction was appropriate with regard to the liability of the three internists, but not as to the liability of Joliet Medical. Nevertheless, perhaps realizing that, as given, this instruction was also applicable to Joliet Medical and that the theory of derivative liability had not been submitted to the jury, defense counsel argued in closing:

> "There has been no evidence, no comments whatsoever, other than the fact that these doctors belonged to the Joliet Medical Group, with respect to any participation by that group, and I think that when you go into the jury room you should not hesitate for a moment, but to bring in a verdict in favor of the Joliet Medical Group and against the plaintiff."

We are confronted, then, with the necessity of deciding whether, in considering the question of inconsistent verdicts, we are to look to the theory alleged, or the theory which was presented to the jury through instructions. The parties have cited no cases wherein an action based upon *respondeat superior* has been erroneously presented to the jury as a case involving individual, separable liability, although defendants insist that, regardless of the circumstances, we must as a matter of law rule in their favor. However, common sense alone dictates that we not ignore the realities of what occurred here. Because we are aware of the theory of *respondeat superior*, the legal inconsistency of these verdicts is readily apparent to us. On the other hand, considering the circumstances from the viewpoint of a jury unversed in the fine points of law, the verdict appears not only consistent, but proper, since there was absolutely no evidence of any individual acts of negligence on the part of Joliet Medical. The jury could have returned a verdict against Joliet Medical only by disregarding the trial court's instructions. For this reason, we find it inappropriate to rule for defendants as a matter of law, and because of the lack of Illinois decisions, we have considered the rulings of courts in other jurisdictions when confronted with similar situations; not surprisingly, there are few cases to consider.

In *Quinn v. St. Louis Public Service Co.* (Mo. 1958), 318 S.W.2d 316, a plaintiff brought a personal injury action against a public transit company and its employee, alleging that the employee's negligent driving was the proximate cause of his injury. The jury returned a verdict for the employee but against the transit company, and the transit company appealed, asserting that the trial court erred in failing to grant its motion for judgment notwithstanding the verdict on

the ground that since it could be liable only on the theory of *respondeat superior*, the verdict against it was legally inconsistent with the verdict for its employee. The Missouri Supreme Court rejected that argument, noting that the instructions given to the jury treated the liability of the two defendants as separable, and the verdict forms—submitted to the jury without objection—allowed it to return separate verdicts. The court therefore allowed the verdicts to stand, noting that "[w]here the parties by their instructions treated the case as if it were one in which a finding could be returned in favor of the defendant driver and against the defendant transit company, they should not be heard to contend that the giving of the verdict forms was not invited." *Quinn v. St. Louis Public Service Co.* (Mo. 1958), 318 S.W.2d 316, 321; see also *Stafford v. Far-Go Van Lines, Inc.* (Mo. App. 1972), 485 S.W.2d 481, 489 (in the event of inconsistent verdicts, judgment against the master will be reversed and the master discharged only if the jury has been properly instructed).

Similarly, in *Baldwin v. Wiggins* (Ky. 1956), 289 S.W.2d 729, the court affirmed a judgment against an employer where the jury had returned a verdict in favor of the allegedly negligent employee, despite the fact that the sole basis for the employer's liability was the doctrine of *respondeat superior*. There, as here, the jury had not been instructed on that issue, but was instructed instead to consider the liability of the two defendants separately. The *Baldwin* court treated the issue as one of waiver, and ruled that since no objection was made to the erroneous instruction, the question was waived for purposes of review.

It appears, then, that the two courts which have considered factual situations similar to the one before us have treated the issue as waived. By so viewing it, the courts did not ignore the theory upon which the case was brought and tried, and thus acknowledged that the verdicts were inconsistent; but, at the same time, they recognized that a jury's verdict should not be overturned where the parties have acquiesced in the giving of instructions which totally negated the theory of *respondeat superior*. We find this reasoning persuasive, since it is consistent with the principle that a party may not induce or acquiesce in an action of the trial court, then, on review, assert that the action was erroneous. (*Ziebell v. Board of Trustees* (1979), 73 Ill. App. 3d 894, 392 N.E.2d 101.) Therefore, we hold that where, as here, a jury is erroneously instructed to consider the liability of defendants separately, and is given a verdict form which permits it to return separate verdicts, and no objection has been made, the parties will not be heard to complain on review that the jury's return of a verdict for

one defendant and against another is inconsistent under the principles of *respondeat superior.*

Defendants further contend that the jury was improperly instructed with regard to the duty of care which they, as specialists, owed to their patient. In instructing the jury on the question of duty and breach thereof, the trial court initially gave IPI Civil No. 105.02, which provides:

> "In treating a patient, a doctor who holds himself out as a specialist and undertakes service in a particular branch of medical, surgical, or other healing science, must possess and apply the knowledge and use the skill and care which reasonably well-qualified specialists in the same field, practicing in the same locality, or in similar localities, ordinarily would use in similar cases and circumstances. A failure to do so is a form of negligence called malpractice."

Defendants agree that this was an appropriate instruction, but maintain that expert testimony was required to establish both the knowledge, skill, and care which a reasonably well-qualified specialist would possess and employ (the standard of care), and whether they in fact possessed and employed that degree of knowledge, skill, and care (breach of duty). Therefore, they posit, the trial court should have given, as they requested, the second paragraph of IPI Civil No. 105.01, which states:

> "The only way in which you may decide whether the defendant possessed and applied the knowledge and used the skill and care which the law required of him is from evidence presented in this trial by doctors called as expert witnesses. You must not attempt to determine this question from any personal knowledge you have."

Instead, the trial court gave a modified instruction, incorporating two non-IPI instructions requested by plaintiff, and charged the jury:

> "One of the ways in which you may decide whether the defendant possessed and applied the knowledge and used the skill and care which the law required of him is from evidence presented in this trial by doctors called as expert witnesses. You must not attempt to determine this question from any personal knowledge you have.
>
> You may also consider a drug manufacturer's recommendations to the medical profession regarding the administration of a drug such as heparin in determining whether a physician properly administered the drug under the facts and circumstances presented.

> Additionally, the hospital's policies may be considered by you in determining whether the physicians met the appropriate standard of care in their treatment of plaintiff's decedent."

It is defendants' position that this modification of IPI Civil No. 105.01 was not necessary under the facts of this case, and that the above instruction inaccurately states the law.

■ We begin our consideration of this issue with the general proposition that the giving of instructions in civil cases is governed by Supreme Court Rule 239(a) (87 Ill. 2d R. 239(a)), which provides:

> "Whenever Illinois Pattern Jury Instructions (IPI) contains an instruction applicable in a civil case, given due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law. Whenever IPI does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given in that subject should be simple, brief, impartial, and free from argument."

Because of the mandatory terms of Rule 239(a), our courts have stated that IPI instructions should be used exclusively where they correctly and adequately charge the jury (*Lay v. Knapp* (1981), 93 Ill. App. 3d 855, 417 N.E.2d 1099), and while there are situations in which the IPI instructions are inadequate, and an additional instruction is appropriate (*Balestri v. Terminal Freight Cooperative Association* (1979), 76 Ill. 2d 451, 394 N.E.2d 391), any departure from approved IPI instructions should be scrutinized with care (*Lay v. Knapp* (1981), 93 Ill. App. 3d 855, 417 N.E.2d 1099), since non-IPI instructions "should be utilized with caution and only where necessary to provide a fair trial" (*Willhite v. Goodman* (1978), 64 Ill. App. 3d 273, 275, 381 N.E.2d 68, 69). We must determine, then, whether IPI Civil No. 105.01 inaccurately or incompletely states the law under the facts of this case so as to justify modification thereof.

■■ As a general rule in medical malpractice actions, the standard of care as well as deviation therefrom must be established through expert testimony "because jurors are not skilled in the practice of medicine and would find it difficult without the help of medical evidence to determine any lack of necessary scientific skill on the part of the physician." (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279, 282.) It is this principle of law which is reflected in the second paragraph of IPI Civil No. 105.01. However, two exceptions to that general rule are noted in *Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, 303 N.E.2d 392. The first exception

encompasses cases wherein the physician's conduct is so grossly negligent, or the treatment provided is so common, that a layman could readily appraise it. There is no contention here that defendants' conduct falls within this category. The second exception noted, and the one with which we are concerned in the instant case, is where a drug manufacturer has provided explicit instructions regarding the proper manner of administering a drug, accompanied by specific warnings of the hazards encountered in its improper administration. However, neither *Ohligschlager* nor, insofar as we can determine, any other case has considered what instructions would be appropriate under those circumstances. The court in *Ohligschlager* merely held that a plaintiff may base a *prima facie* case on a manufacturer's recommendations and warnings, and need not present expert medical testimony. That case does not address what type of evidence would be necessary where, as in the instant case, the defendant presents expert testimony to the effect that such recommendations are not conclusive on the question of the standard of care, and that the failure to follow them is not necessarily a deviation from the accepted standard of care within the medical specialty. Nevertheless, it is plaintiff's position, adopted by the trial court, that *Ohligschlager* is authority for the modification in question, at least as regards that portion thereof concerning drug manufacturer's recommendations, and she argues that under the facts of this case, it was proper to instruct the jury that it could look to those recommendations as a source for the applicable standard of care.

We disagree. This action does not involve, as did *Ohligschlager*, manufacturer's recommendations setting forth explicit instructions on the proper dosage and method of administration accompanied by warnings of an undesirable result should a physician deviate from the precise instructions. Instead, it sets forth only a formula for determining the proper dosage, and there was conflicting expert testimony regarding whether the manufacturer's recommendation on that point was the only acceptable method for determining dosage. Plaintiff's expert testified that standard practice within the specialty of internal medicine was to administer that amount of Heparin which would raise the patient's clotting time to two or three times the normal level. Significantly, he did not purport to base his opinion on the drug manufacturer's recommendations, but on the texts and treatises of experts in the field. Moreover, plaintiff's expert did not state that deviation from the manufacturer's recommendations, standing alone, constituted malpractice. In contrast, defendants' experts, while agreeing that one acceptable procedure for determining dosage was that embodied in the

manufacturer's recommendations, testified that an equally acceptable alternative method was that followed by defendants, *i.e.*, administration of a fixed dosage and maintaining that dosage so long as the patient demonstrated clinical signs of improvement. One expert further stated that deviation from the manufacturer's recommendations, in and of itself, did not constitute malpractice for the reason that physicians must make an independent evaluation of a patient's needs in determining the course that treatment will take.

■ We do not believe that, under the facts presented, deviation from the language of IPI Civil No. 105.01 was either necessary or appropriate. There was extensive, conflicting expert testimony with regard to the appropriate standard of care, and it appears that the drug manufacturer's recommendations merely embodied the standard of care to which plaintiff's expert testified, and we note that this court has recently questioned whether evidence of a manufacturer's recommendations is even admissible where it merely corroborates an expert medical witness's testimony. (See *Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216.) Moreover, we are aware of no case which holds that a drug manufacturer's recommendation regarding dosage, unaccompanied by any warning of adverse consequences if the recommendation is not followed, is proof of the standard of care. In addition, there was some expert testimony here that the recommendations in question did not embody the standard of care, or at least that they were incomplete in this regard. Therefore, we believe that it was error to instruct the jury, in effect, that the drug manufacturer's recommendation was a standard against which defendants' conduct was to be measured. There was a question of fact on that issue, a question which, in our view, the jury could not decide without the aid of expert testimony. The question of fact was placed before the jury in the issues instruction, wherein it was informed of plaintiff's allegation that defendants were negligent in failing to comply with the drug manufacturer's instructions, and defendants' denial that to do so was negligent. Having been instructed that it was to determine whether, in fact, deviation from the recommendations was negligence, the jury should not have been told in the duty instruction that those same recommendations constituted the standard of care against which it was to measure defendants' conduct in deciding the factual issue. It appears to us that since defendants never denied that they deviated from those recommendations, this instruction was tantamount to removing the factual question from the jury. It was told (1) to decide whether defendants should have followed the recommendations and (2) to consider, in so deciding, that defendants must fol-

low the recommendations. In fact, during his closing argument, plaintiffs' counsel—referring to the court's instructions—argued that their burden was met by proof of any one of the negligent acts set forth in the issues instruction which included a failure to comply with the manufacturer's instructions. There can be little doubt how the jury, in following its instructions, would decide the issue.

 For reasons similar to those stated above, we believe that it was also improper to instruct the jury that it could consider the hospital's policies as proof of the standard of care. As with the drug manufacturer's recommendations, the jury was told in the issues instruction that plaintiff asserted defendants were negligent in failing to comply with the hospital's rules and regulations, and that defendants denied that they were negligent in so doing. The testimony of the expert witnesses was similarly in conflict on the question of whether defendants were negligent in deviating from the hospital formulary, or whether the formulary embodied the appropriate standard of care. Those were not questions which the jury could decide without the aid of expert testimony.

 Plaintiff insists that the giving of this portion of the instruction, concerning hospital policy, is supported by *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, wherein the supreme court held that a hospital's bylaws are admissible as evidence of the appropriate standard of care in determining whether the hospital was negligent. However, we find *Darling* inapplicable to the facts of this case, noting initially that neither that decision nor any other case has addressed the admissibility of such evidence with regard to the standard of care to be met by physicians who are neither employees nor agents of the hospital which formulated the bylaws. Furthermore, we are not convinced in the instant case that there was evidence from which the jury could determine exactly what this hospital's "policy" was. Plaintiff presented evidence of the hospital formulary, which appears to embody the standard of care to which her expert testified, *i.e.*, administration of that amount of Heparin which would maintain clotting time at two or three times the normal level. Defendants countered with evidence of a written laboratory procedure from the same hospital, in effect at the same time as the formulary. The treatment provided by defendants appears to have conformed to that statement of laboratory procedure; *i.e.*, administration of a fixed dosage of 30,000 units per day, with daily monitoring of clotting time to insure that the dosage was not too high—presenting the risk of excessive bleeding. The term "hospital policy" used in the instruction was not defined, nor was there any testimony from

which the jury could have determined which of these written statements constituted the hospital's "policy" regarding administration of Heparin. Given the conflict, we cannot determine whether the error in instruction was harmless, since we do not know which written statement the jury viewed as "policy."

Defendants also contend that the verdicts against them were contrary to the manifest weight of the evidence. Since the action is being remanded for a new trial on other grounds, we need only determine whether, as defendants maintain, the evidence mandates outright reversal without remandment for further proceedings. In other words, it is defendants' position that they should have been granted judgment notwithstanding the verdict, and the standard to be applied is therefore whether all the evidence, when viewed in its aspect most favorable to plaintiff, so overwhelmingly favors defendants that no contrary verdict based thereon could ever stand. *Burrow v. Widder* (1977), 52 Ill. App. 3d 1017, 368 N.E.2d 443.

Defendants initially argue that plaintiff failed to establish the standard of care to be followed in administering Heparin, asserting that their own testimony, as well as that of their expert witnesses, proved that the treatment provided was in accord with accepted practice in the field of internal medicine. However, we note that defendant Dr. Cerniak's testimony to that effect was impeached by his statement in a deposition that the therapeutic range for Heparin was approximately double the control time. We further note that the testimony of Dr. Buckingham, testifying as an expert witness for defendants, was impeached in a similar manner. In addition, another of defendants' experts, Dr. Wessler, tempered his statement that the treatment provided was acceptable with the qualification that this was his personal opinion, and that many recognized experts, perhaps the majority, would disagree with his view.

In their argument on this issue, defendants also rely on the fact that plaintiff's expert agreed that there was some controversy over the need to monitor treatment through the use of testing. However, the expert further stated that the vast majority of specialists agreed that thrombophlebitis is best treated through monitoring of clotting time to achieve an anticoagulation effect of two or three times the normal level, and that the hospital formulary indicated that this was the accepted method within the locality where defendants practiced. Moreover, that expert also stated that it was not considered good medical practice to follow new, unproved theories, as he characterized the treatment provided, when known, widely accepted methods existed to achieve the same result. In *Walski v. Tiesenga* (1978), 72 Ill.

2d 249, 381 N.E.2d 279, our supreme court indicated that such testimony is sufficient, where experts are in conflict on the applicable standard of care, to create a question of fact to be decided by the jury.

Defendants further maintain that even if it were shown that the treatment provided deviated from the standard of care, there was no evidence from which the jury could have concluded that their breach of duty was the proximate cause of Young's death. They assert that since it appeared from the autopsy reports that some of the clots developed prior to his admission to the hospital and that it was impossible to determine the age of the clot that killed him, the jury's verdict could only have been based on speculation because it was undisputed that Heparin does not dissolve preexisting clots.

We disagree. All of the experts stated that the proper use of Heparin will prevent preexisting clots from increasing in size and reduces the possibility that those clots will embolize, i.e., break free from the wall of the blood vessel and travel to another part of the body. In this case, defendant Dr. Cerniak described the clot which caused Young's death as massive in size, and suggested that this indicated it was formed "in part" before Young was admitted to the hospital. If it was formed only in part prior to that time, then from the expert testimony the jury could logically have concluded that the proper use of Heparin would have prevented it from increasing in size. Plaintiff's expert explained that, if properly treated, preexisting clots will, over the space of a few days, become firmly attached to the walls of the vessel through a process called organization. However, if improperly treated, the clots will continue to grow, preventing organization from occurring. The expert further explained that it is the larger, growing clots which have not undergone organization that embolize. If the jury accepted all of this testimony as true, it could have concluded that it was more probable than not that, had defendants properly treated Young, the clot which caused his death—even assuming that it started to form before treatment began—would not have continued to increase in size thereafter, becoming so massive as to prove fatal, and would have gone through organization and thus been prevented from embolizing.

Finally, defendants assert that the evidence failed to establish that they deviated from the standard of care by ignoring symptoms indicative of pulmonary embolism. They acknowledge that while the experts agreed that pulmonary embolus is difficult to diagnose, since it has no definitive symptoms, all testified that the weak spells and profuse sweating reported by Young on the third day of hospitalization were a

possible symptom of pulmonary embolism which required further investigation. However, they maintain that the record establishes that they did not ignore this symptom and that defendant Dr. Kassel examined Young carefully, inquired about the spells reported, and determined that they were not indicative of pulmonary embolism.

With regard to the standard of care in treating pulmonary embolism, we note that only one expert testified concerning how the symptoms in question should have been investigated further. Dr. Linhart, plaintiff's expert, stated that there were numerous signs that embolization might have been occurring, including mild enlargement of Young's heart and pulmonary arteries, persistent fever, and the dull ache in his chest reported on admission, as well as the weak spells, profuse sweating, and increased respiration rate reported on the third day of hospitalization. He opined that while no one of these symptoms was conclusive, good medical practice required that they be followed up not only through examination of the patient but through available tests which would have disclosed the presence of emboli. The record shows that no tests were performed. It is our view that this testimony was sufficient to raise a question of fact to be decided by the jury.

In sum, we do not believe that the evidence so overwhelmingly favored defendants as to require entry of judgment in their favor at this time. Therefore, for the reasons stated herein, the judgment for plaintiff is reversed, and the cause remanded for further proceedings consistent with the views expressed herein.

Reversed and remanded.

LORENZ and O'CONNOR, JJ., concur.