BEVERLY PIANO et al., Plaintiffs-Appellants, v. WILLIAM C. DAVISON et al., Defendants-Appellees.

First District (3rd Division) No. 86—789

Opinion filed June 24, 1987.

Frank C. Stanley, of Chicago, for appellants.

William V. Johnson and Thomas H. Fegan, both of Johnson, Cusack & Bell, Ltd., and Michael J. Gallagher, Michael J. Morrissey, and Michael G. Thomas, all of Cassiday, Schade & Gloor, both of Chicago, for appellees.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff Beverly Piano brought this medical malpractice action against defendants, Drs. William C. Davison and James J. Duffy, alleging negligent diagnosis and negligent surgical treatment. Beverly's husband, plaintiff George Piano, sought damages for loss of consortium against both doctors. A jury returned verdicts for defendants, and the trial court entered judgment on the verdicts. Plaintiffs appeal, contending that the trial court erred in not entering a judgment notwithstanding the verdicts; that a guardian *ad litem* should have been appointed for Beverly; and that numerous reversible errors oc-

curred in connection with the testimony of expert medical witnesses.

The medical records and testimony revealed the following sequence of events. In June 1981, plaintiff saw Dr. Benjamin Lichtenstein, a neurologist, complaining of dizziness. In December 1981, plaintiff saw Dr. Davison, a neurologist, complaining of dizziness, depression, nausea, loss of balance, and blurred vision. On January 5, 1982, plaintiff was admitted to the hospital from the emergency room with complaints of dizziness and loss of memory. Patricia Capraro, a friend of Beverly's, and Leonora Piano Reinecke, plaintiffs' daughter, testified that they found nothing unusual about Beverly's appearance, gait or conversation on January 5, 1982. Leonard Boltz, a cousin of Beverly's, took her to the hospital on January 5 because she repeatedly exhibited confusion that morning. Beverly could walk unassisted. George Piano testified that before the hospitalization Beverly experienced dizziness, but he noticed nothing unusual about her mental condition.

A January 6, 1982, progress note written by Dr. Davison stated that the patient "shows severe hydrocephalus—Arnold-Chiari? obstruction?" A second January 6 note by Dr. Davison stated "communicating hydrocephalus, question—could this be normal pressure hydrocephalus." A cisternogram and spinal fluid examination were scheduled. A January 6 notation in the medical chart stated that plaintiff was confused, forgetful, exhibited an uneven gait and appeared disturbed and agitated. A January 6 CT scan showed a "striking massive dilatation of the fourth ventricle."

A January 7 notation stated that plaintiff "forgets quickly recent events," and was confused. On the same day, Dr. Duffy dictated and signed a typewritten progress report, which was also signed by George. The report stated that Beverly "has normal pressure hydrocephalus, is ataxic and extremely demented. *** Mrs. Piano has to be considered incompetent. I tried to explain to her; she does not really grasp what she is being told." Dr. Duffy recommended a shunt operation.

On January 8, 1982, at 1 a.m., the attending nurse found plaintiff on the bathroom floor with a head laceration. Plaintiff's gait was very poor, and she was upset. Later that day, Beverly underwent a surgical operation placing a shunt, or drain, within her brain in order to drain excessive fluid. On February 28, 1982, plaintiff was discharged from the hospital.

In regard to plaintiff's post-surgical condition, George Piano, Boltz, Capraro and Reinecke testified that Beverly was confused and unable to answer many questions. She was bedridden, unsure of

where she was, agitated, experienced urinary incontinence, and often did not recognize friends or family members. She was partially paralyzed on the left side.

·On July 10, 1982, Dr. Davison examined plaintiff and found she had "improved since her discharge." She still experienced cognitive problems and some paralysis on the left side. She could walk with a cane. The report stated that "the etiology of the hydrocephalus was never adequately established. She had a very large fourth ventricle, and it was felt that an obstructive process *** was a possibility."

Dr. Kenneth Pierini testified for plaintiffs that he began treating Beverly in early 1983 when she was hospitalized. "She supposedly had some seizure witnessed in the emergency room ***." Dr. Pierini testified that in treating plaintiff he relied on the report of Dr. Bauer, a neurosurgeon whom he had asked to examine plaintiff and determine the cause for the alleged seizure. Dr. Bauer stated in the report that the shunt was operating correctly. "[W]hatever this woman had, be it seizure or not, was not related to the shunt in any way." Dr. Bauer concluded, "The etiology of her seizure disorder is not clear to me, at present, but perhaps could be related to virtually any trauma or manipulation of the brain, including a shunt; although, this would be quite rare."

The medical evidence included testimony offered by plaintiffs' medical experts: Dr. Bernard Sussman, a neurosurgeon; and Dr. Benjamin Lichtenstein, a neurologist and Beverly's treating physician from June 1981 to September 1981. Defendant Dr. Duffy, a neurosurgeon, testified on his own behalf, along with his expert witness, Dr. Charles D'Angelo, a neurosurgeon. Defendant Dr. Davison, a neurologist and plaintiff's treating physician from December 1981 through July 1982, testified on his own behalf along with his expert witness, Dr. David McLone, a neurosurgeon.

The record reveals that the voluminous medical evidence in this action broke down into two major issues: negligence in making a preoperative diagnosis, and negligence in performing the surgery.

As to the negligent diagnosis issue, plaintiffs attempted to prove that prior to surgery defendants conclusively and incorrectly diagnosed normal pressure hydrocephalus (NPH), when the correct diagnosis was probably obstructive hydrocephalus. Plaintiffs maintained that the best surgical treatment for Beverly's hydrocephalus is exploration of the posterior fossa in the brain, and not a shunt procedure. The correct diagnosis could have been determined by performing certain diagnostic tests prior to surgery. The absence of certain classic symptoms should have indicated to defendants that Beverly did not

suffer from NPH. Plaintiffs further urge that defendants negligently and erroneously portrayed Beverly's condition as being critical and requiring immediate surgery.

In regard to the allegedly negligent surgical treatment, plaintiffs attempted to prove that during surgery, Dr. Duffy negligently placed the burr hole in the skull and negligently inserted an excessive amount of tubing into the brain, thus damaging a vital area, which resulted in Beverly's partial paralysis. Furthermore, plaintiffs argued that the shunt did not operate properly for several weeks, by which time considerable permanent damage had occurred.

In regard to whether a definitive diagnosis of NPH was made prior to surgery, Dr. Sussman testified for plaintiffs that the definitive diagnosis of NPH was repeatedly indicated on hospital progress notes, surgical reports and the discharge sheet. Dr. Sussman also testified, however, that a preoperative note written by Dr. Davison, listing several possible diagnoses, was only "a consideration, I would say, of three possibilities, which is what a differential [diagnosis] is."

Dr. Lichtenstein testified for plaintiffs that the records showed that prior to surgery there was "contemplation" that the problem could be NPH. It was merely a diagnosis "to be considered," along with other possibilities, including obstructive hydrocephalus. Drs. Davison and Duffy agreed.

In regard to whether it was negligent for defendants to even consider diagnoses of NPH or Arnold-Chiari, Dr. Sussman testified for plaintiffs that a reasonably prudent surgeon in Cook County would not make these diagnoses. Arnold-Chiari is a condition which affects infants and in which the fourth ventricle is either not seen or markedly reduced in size. Dr. Sussman agreed that "under extremely rare circumstances" Arnold-Chiari is seen in adults, but that even then the fourth ventricle would not be enlarged.

Dr. Davison testified that Arnold-Chiari is a pathological condition which can cause obstructive hydrocephalus. Of the four types of Arnold-Chiari, one type can be associated with adults, but 90% of the cases are associated with infants.

Dr. Sussman testified further that there was no evidence in the record to support a diagnosis of NPH. Such a diagnosis depends upon the presence of a clinical triad of incontinence, gait disorder and impairment of mental function.

In regard to the classic triad of symptoms of NPH, Dr. Davison testified that in 1982, the neurologic literature suggested that a diagnosis should be made as soon as possible. "By the time you reach the triad usually shunting has less chance of working." The three classic

symptoms are late signs of NPH. Drs. D'Angelo and McLone testified similarly.

Dr. Sussman testified further that NPH should not have been considered because the ventricles had not increased in size during the six months prior to surgery. From the June 1981 and January 1982 CT scans, Dr. Sussman selected certain pictures which portrayed various "slices" of Beverly's brain to demonstrate there was "not any real change in the size of the ventricles between the two studies." The neuroradiologists' report differed. The June 1981 report stated there was a moderate degree of dilatation of the fourth ventricle. The January 1982 report found a "striking massive dilatation of the fourth ventricle." Dr. Sussman found the latter to be a fair statement and believed that it was more accurate than the earlier report.

In regard to documentation of increased intracranial pressure and the size of the ventricles, Dr. Davison compared the two CT scans and found the ventricles had become "greatly enlarged" by January 1982. This enlargement indicated an increase of pressure within the brain. Dr. Sussman's selection of pictures from the June 1981 CT scan could not be compared with the January 1982 scan because it was necessary to compare the complete scans, not just a few pictures, and because the pictures chosen by Dr. Sussman did not even show the fourth ventricle. Drs. McLone and D'Angelo agreed. Dr. McLone testified that no qualified neurosurgeon would review a CT scan based on two cuts. In addition, Dr. McLone testified that the transcellular fluid in the edema surrounding the ventricular system indicated pressure. A reasonably well-trained and well-qualified neurosurgeon who has had a significant number of hydrocephalus cases should be able to make a determination as to whether there was progression shown in the two scans.

Concerning the preoperative tests required to determine whether NPH was an accurate diagnosis, Dr. Sussman testified that a reasonably competent surgeon would not operate with a diagnosis of NPH based upon the preoperative diagnostic work performed on Beverly. In order to make a diagnosis, a spinal tap or cisternogram must be done to measure the pressure and to determine whether there is a reversal of flow in the system. Dr. Sussman testified that it was safe to do a spinal tap.

Dr. Lichtenstein testified for plaintiffs that, because a cisternogram requires 24 to 36 hours, "if the patient was critical, it would be stupid to do a cisternogram." Dr. Lichtenstein testified that where obstructive hydrocephalus is suspected, you do not do a spinal puncture first, because it could kill the patient. Similarly, Dr. Davison testified

that these tests both involved a spinal puncture. If he took the pressure from below the brain stem, the brain "could herniate or move through the base of the skull," and the patient would die. Drs. D'Angelo and McLone testified similarly. Dr. D'Angelo also testified that the preoperative work-up complied with the accepted standard of care by neurologists and neurosurgeons treating this condition.

Concerning the proper surgical treatment for Beverly's condition, Dr. Sussman testified for plaintiffs that the first surgical choice should have been a posterior fossa exploration. A shunt procedure, however, was an acceptable operation for an obstructive hydrocephalus. He disagreed with the other medical witnesses in regard to whether Beverly's clinical condition had deteriorated to the point that she needed an emergency shunt. The basis of his opinion was the fact that he believed Beverly's condition had not changed significantly over a period of six months. Moreover, even if there were evidence of increased intracranial pressure, certain drugs, such as decadron and mannitol, could manage the intracranial pressure while buying time for the doctors to make a definitive and proper diagnosis before surgery.

In regard to whether Beverly was in critical condition and needed a shunt operation, Dr. Lichtenstein testified for plaintiffs that the medical records showed Beverly "evidently became critical" and the neurosurgeon decided to perform the "emergency procedure, a life-saving procedure." Dr. Lichtenstein found no statement in the record which indicated that Beverly was in critical condition. The doctors' notes could imply, however, that plaintiff was critical. Dr. Lichtenstein believed it was an emergency situation and concluded that a neurosurgeon with a good background, training and expertise must be able to exercise clinical judgment and determine whether the situation was an emergency. Dr. Lichtenstein added that he was "in no position to say the shunt should not have been done."

In regard to whether surgery was necessary and the emergency nature of Beverly's condition, Dr. Davison testified that there was a significant difference in the patient from mid-December 1981 to early January 1982. Dr. Davison explained, "She was deteriorating clinically. She had gone from a normal person to someone that did not think well, could not remember, could not walk. Her ventricular size *** had increased in January of 1982, showing that these spaces within the brain were getting larger." Dr. Davison concluded that, "We had two choices: We could let the patient die, or put a shunt in to relieve the pressure. I don't know of any third choice in this patient." A shunt was the only treatment of choice for any of the possi-

ble diagnoses being considered.

Dr. Davison opined that surgical exploration of the posterior fossa, *i.e.*, to open the back of the head to relieve pressure, should not have been done. Dr. Davison testified that mannitol and decadron were not considered proper treatment for hydrocephalus.

Drs. Duffy, McLone and D'Angelo testified similarly regarding the treatment of choice; the urgent nature of the condition; and the danger of surgically exploring the posterior fossa. In addition, Dr. McLone testified that the standard of care for a neurosurgeon practicing in the Chicago area in 1982 would require the surgeon to "establish a drainage for the cerebral spinal fluid, to reduce the pressure and the fluid within the ventricles of the brain, and to place a shunt." While Dr. McLone saw no changes in Beverly's blood pressure or vital signs to indicate a crisis situation, he believed that Beverly's condition was urgent.

Dr. D'Angelo added that he was familiar with the standard of care for neurosurgeons practicing in Cook County in 1982. In his opinion, Beverly was "not only a candidate for a shunt procedure, I think if a shunt procedure had not been done, the physicians in the case probably would have deviated from standard care." Furthermore, a reasonably well-qualified neurosurgeon practicing in Cook County in 1982 or today would not perform an exploration of the posterior fossa to relieve the pressure in Beverly's brain.

Dr. Duffy added that he may have told George Piano that without surgery Beverly might die the next day, because Dr. Duffy was afraid that might in fact occur. Dr. Duffy admitted that there was nothing in the hospital records indicating plaintiff was in critical condition during the three days prior to surgery. Her blood pressure and pulse, *e.g.*, did not indicate any danger.

In regard to the issue of whether Dr. Duffy negligently performed the surgery, Dr. Sussman testified for plaintiffs that the burr hole was incorrectly placed in the skull; excessive tubing was inserted into the brain; the tip of the shunt was improperly buried in the internal capsule; the shunt initially did not work; and the unnecessary complications suffered by Beverly were a direct result of the shunt operation. Dr. Sussman testified that the burr hole was forward and high. It was in "a totally unacceptable position." When asked if Beverly's X ray in fact shows the burr hole behind the ear, Dr. Sussman responded that the X ray was being held incorrectly. The position of the X ray altered the relationship of the burr hole and the ear. Dr. Sussman had only viewed the X rays and had never examined Beverly to ascertain the placement of the burr hole.

Dr. Sussman testified further that an authoritative medical text showed the burr hole located at almost the same point at which Dr. Duffy drilled Beverly's, but her ventricles were not like the ventricles portrayed in the book. Dr. Sussman also testified that the manufacturer of the shunt includes information as to its recommendation for the use of the device, including an illustration as to how to insert the shunt.

In regard to placement of the burr hole, Dr. Duffy testified that he was instructed how to insert the shunt by its inventor. The surgical report he dictated stated that during Beverly's operation the small burr hole was placed in the usual manner. Dr. Duffy testified that, "By that I mean that it is my custom to make a burr hole anywhere. I don't care where it is." Dr. Duffy chose the site of the burr hole depending on its purpose. He places it where he feels "that it will be easiest for me to get into the ventricle, and where I have the most experience in it." In Beverly, Dr. Duffy placed the burr hole behind and above the ear, which was where he usually placed the hole for hydrocephalus patients.

Dr. Duffy testified that the neurosurgical community does not rely upon package inserts of manufacturers to determine burr hole placement. Additionally, the various manufacturers showed different locations for placement of the burr hole. A neurosurgeon would never decide where to place the hole based on a manufacturer's drawing. The illustration provided by the manufacturer was of an infant with a massively enlarged head. The shunting procedure could be different for a child because with a massively enlarged head, "you can put the burr hole almost anywhere because the ventricles are so tremendous that you fall into them." Notwithstanding these qualifications, Dr. Duffy placed the burr hole near the same area as that depicted in the manufacturer's illustration.

Dr. D'Angelo testified that usually a burr hole is placed in the posterior parietal area. "However, after you accumulate experience, everyone puts their hole somewhere in that area, but not exactly." As a neurosurgeon does more and more shunts, "he will determine what his own landmarks are. *** It all depends on what works in your own hands." Keeping in mind the standard of care of neurosurgeons practicing in Cook County, and even nationally, Dr. Duffy placed the burr hole in a proper location. Dr. D'Angelo testified that the skull X ray of Beverly shows the burr hole correctly placed in a posterior parietal position regardless of how the X ray is held. Dr. McLone agreed and opined that Beverly's burr hole was "where most people would like the burr hole to be placed."

Regarding the insertion of the shunt tubing, Dr. Sussman explained that after a burr hole is drilled, a cannula is placed in the brain through the burr hole, until it hits ventricular fluid, which is a clear fluid. Then you substitute the catheter into the ventricle. If the doctor has placed the burr hole in the wrong place, however, he could not make the assumption that the catheter is in the ventricle. Beverly's catheter passed by the ventricle, turned and went into the opposite ventricle and then finally, in a rolling loop, into the right ventricle. In Dr. Sussman's opinion, the path of the catheter was "totally unacceptable." Dr. Sussman admitted that the catheter is flexible and can twist around in the ventricle. "You can get some general loops. You can't get the kind of loop you have here." A reasonably well-qualified neurosurgeon in Cook County would not have placed or passed the catheter in the manner which he described. Dr. Sussman agreed, however, that even after placing the burr hole correctly it might take "one or two passes" to get the shunt in correctly.

Concerning the depth of the catheter in the brain, Dr. Sussman testified that almost 20 centimeters of tubing was placed into Beverly's brain. "That's twice what it ought to be." A reasonably prudent neurosurgeon would know during the operation that, once he went beyond 10 centimeters, he would be putting too much catheter into the ventricle system.

Concerning the insertion of the tubing, Dr. Duffy testified that he had difficulty getting the cannula all the way in and had to make two passes. In regard to excessive length, Dr. Duffy explained that a surgeon must put the catheter down far enough in the ventricle to get a sufficient flow of cerebral spinal fluid. Any board-certified neurosurgeon may miss the ventricle. In a neurosurgical community of board-certified, well-qualified neurosurgeons performing this same procedure, all face the same risk of having the tubing bounce off something or otherwise become misplaced. Dr. Duffy testified that the procedure is "absolutely blind." Dr. McLone agreed with this characterization. Dr. Duffy only knew the shunt was in the ventricle when crystal clear fluid came back out, which did occur during Beverly's operation.

Dr. McLone testified that Beverly's shunt tubing gets into the ventricle and turns back a distance within the ventricular system. "That's less than an optimal place to enter." However, this situation was common because the surgeon is performing a blind procedure. Dr. McLone would accept a functioning shunt even though it was not optimally placed. Dr. McLone had no criticism of the fact that Dr. Duffy had to make two passes with the cannula. Moreover, the loop did not cause any harm in the brain. The catheter is very soft and will bounce

off a structure rather than penetrating it. Dr. McLone could not "imagine how it could have" harmed Beverly. Dr. D'Angelo testified similarly.

Concerning the excessive insertion of the tubing, Dr. McLone testified that in Beverly's case the tubing was about 12 or 13 centimeters of catheter. It is better to have it functioning at 10 centimeters or less. "But it's not uncommon in an adult to have it exceed ten centimeters. It happens." Dr. D'Angelo testified that there was more shunt tubing put in than he would normally put in, but it was totally incorrect to say that Dr. Duffy "kept shoving" the tubing in for too long.

In regard to whether the tip of the shunt is buried in the internal capsule, Dr. Sussman testified that the January 13 CT scan showed the hemorrhage in the brain along the path of the catheter and in the internal capsule. "It's so gross and obvious." The damaging effects would affect the thinking process. A surgeon "can't possibly get a hemorrhage in the internal capsule with the shunting procedure if the shunt is put in at the proper place." Dr. Sussman concluded that some of the shunt was in the ventricle, and some of it was outside of the ventricle. He illustrated this by marking on a schematic drawing where the internal capsule itself is located.

Dr. Davison testified that the tip of the catheter is in the expected region of the front horn of the right lateral ventricle. The catheter was "where it should be. That is why it worked." Dr. Sussman incorrectly marked on an exhibit the location of the internal capsule. Dr. McLone agreed and added that to say the tip is in the internal capsule is "again another mistaken understanding of the anatomy." Dr. McLone continued, "We would like the tip of the catheter to end up in the anterior part of the lateral ventricle. In this case it does. It just got there in a different way."

Dr. Duffy testified that there was no blood in the area of the ventricle. Dr. Duffy did, however, see "streaks of blood in the brain, not in the ventricles, in the brain, on the right side." CT scan reports dated January 13 and 18 find the tip is "in the expected region of the frontal horn of the right lateral ventricle." A January 26 CT scan report found the "blood in the region of the right internal capsule is no longer present."

As to whether the shunt worked, Dr. Sussman testified that after several weeks the catheter began draining the ventricle. In regard to whether the shunt caused Beverly's mental problems, Dr. Sussman agreed that she had mental problems before surgery, but the further deterioration of her mental status was related to the surgery. The

damage was caused by traumatic edema of the right side; hemorrhagenic damage in the right side; and "generalized damage related to a surgery of intracranial pressure during the period that the ventricles got even larger in size than they were preoperatively following the operation, as a result of blood released into the cerebral spinal fluid pathways from the hemorrhage." Dr. Sussman also testified that Beverly's mentation improved slightly.

Concerning the success of the shunt, Dr. Davison testified that the shunt did work. "The ventricle size came down to normal and remained there." The shunt may have saved plaintiff's life. The surgery was meant to "keep her from getting worse. If she got better, I would have been pleased."

Dr. Davison noted there was some evidence of some edema, or brain swelling, post-operatively. The edema or bleeding did not, however, damage Beverly's intellectual capacity as evidenced by the fact that her mentation before and after surgery was the same. Dr. Davison relied on his own preoperative examination of Beverly, and on preoperative nurses' notes reporting Beverly's loss of memory, disorientation and confusion. Dr. Davison was of the opinion that the shunt operation did not further damage Beverly's cognitive functions. The post-surgical motor and sensory dysfunction on her left side were not related to cognitive functions. On July 10, 1982, Dr. Davison examined Beverly. He concluded that she had improved since her discharge. While she could not recall her recent medical history, she knew, e.g., the date and the name of the hospital.

Dr. McLone testified that the shunt was functioning, as evidenced by the postoperative decrease in size of the ventricles. In regard to Beverly's mental functions, Dr. McLone opined, "We can only theorize why her mental state did not return to normal." The shunting procedure itself, however, did not have any effect on her mental deterioration. Dr. McLone also did not think Beverly's impaired mental functions were related to the paralysis. The cognitive problems could possibly be related to the fact that she had longstanding hydrocephalus.

Dr. Duffy testified that initially he was unsure whether the shunt was working properly, but shortly after surgery he concluded that the shunting procedure was a success in that it reduced the size of the ventricles to normal, and thus saved her life. Surgery did not, however, produce good results insofar as her dementia or her gait were concerned.

Dr. Duffy testified that Beverly's mental condition was approximately the same before and after surgery. It was not unusual that a

patient who was demented before surgery would not become normal after surgery. In Beverly's case, there was not enough edema caused by the invasive techniques to have affected her cognitive functions. He had never seen edema from a shunt cause dementia. Shunts might work, while the cognitive condition did not improve. Dr. Duffy testified that the shunt would not in any way affect a patient's bladder or urinary process.

Dr. D'Angelo testified that Beverly's shunt worked as it was intended because it drained off spinal fluid and the ventricular system was smaller. Dr. Duffy complied with the relevant standard of care of a neurosurgeon in treating Beverly, notwithstanding the failure of her mentation to improve. The shunt is meant to get rid of the pressure.

In regard to whether the shunt functioned properly, a January 9 CT scan report indicated that there had been a decrease in the size of the lateral ventricles since the presurgical scan of January 6. A January 13 CT scan report states that the left lateral ventricle and fourth ventricle had increased in size and were "almost equal in size to that seen on the preoperative study of January 6, 1982." The remaining scans showed a gradual decrease in the size of the ventricles until February 9, when they had returned to normal size.

Concerning complications which resulted from the surgery, Dr. Sussman testified that if some paralysis follows a shunt operation, "it probably means you introduced that shunt improperly." It is possible, but not probable, for paralysis to occur even if the shunting is done properly. Dr. Sussman testified that you "should not" get hemiparesis or hemiparalysis as a result of shunting, as Beverly did.

Dr. D'Angelo testified that even if the surgeon is using the proper degree of care, the shunt operation carries numerous complications and risks, including hemorrhage and paralysis. A well-qualified, well-trained neurosurgeon cannot prevent hemiparesis or hemiplegia from occurring because shunting is a blind procedure. The insertion of the cannula is one of the risks of this procedure which cannot be avoided. Dr. Lichtenstein agreed.

In regard to complications following surgery, Dr. Duffy testified that the surgery caused the paralysis on plaintiff's left side. The inventor of the shunt reported to Dr. Duffy that he frequently encountered the same complication. Edema, or swelling, is an expected side effect and it does not always cause further brain damage.

Dr. Duffy testified further that Beverly's mental condition may be permanent. It had slightly improved after surgery, but she was "still demented." Dr. Duffy testified that a urinary condition could be caused by dementia. Dr. Duffy emphasized, however, that any urinary

problems were not a direct result of the surgery. Dr. Davison testified similarly.

Dr. McLone testified that hemiplegia is a recognized complication of shunting because the catheter is surrounded by the pathways for the motor system. He stated further that the CT scans showed some blood along the tracks of the shunt. "I was one of the people who participated in the development of the catheter, the shunt system, the uni-shunt. *** It's unfortunate that in about 10% of the cases we do a CT scan after and find some blood along the track." Regarding the cause of the paralysis, Dr. McLone believed that there were two possibilities. "If the shunt went low you get the internal capsule. If it went high it would get the radiating fibers. So you're at risk in two directions, and I'm not sure this shunt perverses the internal capsule. But it could miss the internal capsule and catch the motor fibers." Dr. McLone opined that Beverly became paralyzed as the result of the shunt going through and interrupting the motor fibers that control the outside of her body.

At the close of all the evidence, the jury found for defendants and against plaintiffs. Judgment was entered on the verdict and plaintiffs' post-trial motion was denied. Subsequently, George was appointed as the plenary guardian of the estate and person of Beverly in the probate division of the circuit court.

■■■ Plaintiffs first contend that the trial court erred in not entering a judgment notwithstanding the verdict. A party is entitled to a judgment *n.o.v.* only in cases where all the evidence, when viewed in a light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) A jury's verdict will be overturned when it is against the manifest weight of the evidence. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.) A verdict is contrary to the manifest weight only if it is wholly unwarranted by the evidence, and not when the evidence is merely conflicting and the jury resolves the conflict. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.) The application of the *Pedrick* standard to medical malpractice cases requires the reviewing court to scrutinize the medical evidence submitted by plaintiffs in support of their case. (*Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216.) We have thoroughly examined all of the evidence contained in the record and find that plaintiffs' motion for a judgment *n.o.v.* was properly denied.

■ Initially under this issue plaintiffs complain that evidence regarding the proper standard of care was elicited from defendants'

witnesses through the improper use of leading questions. Plaintiffs cite, *e.g.*, defense counsel's question posed to Dr. D'Angelo regarding whether he was aware that "before the shunt procedure was performed, there was no cisternogram performed" and whether he had any criticism of that omission. Dr. D'Angelo offered a lengthy reply, describing the risks of a cisternogram; explaining the procedure itself; and analyzing the potential benefits and dangers of performing such a test on Beverly. Defense counsel did not suggest this technical and detailed answer to the medical expert. Counsel did no more than focus the witness' attention to the fact that a certain procedure had not been performed, a fact about which no controversy existed. This type of question, and other similar examples cited by plaintiffs, is not impermissible.

█ Plaintiffs urge that a judgment *n.o.v.* in their favor was required because defendants failed to refute their evidence as to the standard of care. In a medical malpractice action, plaintiffs bear the burden of establishing the standard of care by which the defendant physician's conduct is to be measured and the breach of that standard which resulted in the injury. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.) Where the parties offer conflicting medical testimony regarding the applicable standard of care and defendants' breach of that standard, the jury is uniquely qualified to resolve the conflict, and a judgment *n.o.v* is not required. *Martin v. Zucker* (1985), 133 Ill. App. 3d 982, 479 N.E.2d 1000; *Sheahan v. Dexter* (1985), 136 Ill. App. 3d 241, 483 N.E.2d 402.

In the present case, the parties offered conflicting expert testimony on the proper standard of care and defendants' alleged breach of that standard, including evidence regarding preoperative diagnostic procedures, the decision to perform the surgery, and the surgical operation itself. We do not believe that the evidence so overwhelmingly favored plaintiffs as to require entry of judgment *n.o.v* in their favor. The conflicting testimony on almost every medical question as to the proper standard of care for diagnosing and surgically treating Beverly's condition was sufficient to raise a question of fact to be decided by the jury. See *Martin v. Zucker*; (1985), 133 Ill. App. 3d 982, 479 N.E.2d 1000; *Young v. Cerniak* (1984), 126 Ill. App. 3d 952, 467 N.E.2d 1045.

█ Plaintiffs also contend that the jury was not entitled to find in favor of defendants because defendants' witnesses testified as to what they personally would have done, and thus failed to present standard of care evidence refuting the testimony of plaintiffs' witnesses. (See *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279;

*Chamness v. Odum* (1979), 80 Ill. App. 3d 98, 399 N.E.2d 238.) In the present case, the parties presented testimony as to the relevant standard of care as to most medical questions. Thus, even if portions of the testimony were based on what the witnesses personally would have done rather than what was generally recognized as appropriate within the profession, the unchallenged portions of the witnesses' testimony adequately established the standard of care. See *Chamness v. Odum* (1979), 80 Ill. App. 3d 98, 399 N.E.2d 238.

Furthermore, as to some medical questions, *e.g.*, the proper placement of the burr hole, testimony revealed that there were equally acceptable alternative methods which doctors might properly use. Illinois courts recognize that medicine is not an exact science, but instead is a profession which involves the exercise of individual judgment within the framework of established procedures, and thus differences of opinion are consistent with the exercise of due care. *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.

Plaintiffs next contend that the trial court erred in denying their post-trial motion for a new trial and for the appointment of a guardian *ad litem* for Beverly. Beverly testified at trial. She answered some preliminary factual questions correctly, but exhibited confusion about other facts, *e.g.*, concerning the dates of birth of her children, and whether she was presently employed. Defendants refused to cross-examine Beverly and argued she was not competent to testify. Counsel for plaintiffs argues that Beverly answered questions very competently. The trial court denied defendants' motion for a mistrial and allowed Beverly's testimony to stand. In this court, plaintiffs argue that the "admissions by the attorneys for the defendants that Beverly Piano was incompetent to stand trial resolves said issue in total." Plaintiffs conclude that there is "little doubt that Beverly Piano was 'declared' to be an incompetent bringing to force the statute *** to appoint a next friend or guardian *ad litem*."

A distinct difference separates a probate court's adjudication declaring a person legally incompetent, from a trial court's decision that a person's mental condition is such that his testimony would be completely untrustworthy, thus rendering him incompetent to testify. (See *People v. O'Neal* (1977), 50 Ill. App. 3d 900, 365 N.E.2d 1333 (where the court found a witness competent to testify notwithstanding a previous adjudication declaring him to be feebleminded).) In addition, section 2—1008 of the Code of Civil Procedure provides that a guardian *ad litem* shall be appointed if a party is "declared to be a person under legal disability." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1008.) It is not reversible error to fail to appoint a guardian *ad litem* for an adult

litigant who has not been formally declared an incompetent. (*Freiders v. Dayton* (1978), 61 Ill. App. 3d 873, 378 N.E.2d 1191.) Such an adjudication was not sought here until after trial, and thus no error occurred.

■ Plaintiffs next contend that the trial court erred in not permitting plaintiffs' experts to use medical treatises as substantive evidence. Plaintiffs concede that Illinois law provides that treatises may only be used for impeachment purposes, and may not be introduced as substantive evidence. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279; *Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779; *Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216.) Plaintiffs urge this court, however, to alter the existing rule in Illinois by adopting Rule 803(18) of the Federal Rules of Evidence, which permits experts to read into evidence, during direct examination, statements contained in learned treatises established as reliable authority. While we question the need of altering Illinois law, we need not decide whether Rule 803(18) should be adopted. Plaintiffs have failed to make an adequate offer of proof and thus have not preserved the issue for review. See *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.

■ An adequate offer of proof requires the trial court to be aware of what the offered proof is, or what the expected testimony will be, by whom or how it will be made, and its purpose. (*Simon v. Plotkin* (1977), 50 Ill. App. 3d 603, 365 N.E.2d 1022.) Here, the names of certain articles and textbooks were read into the record. While plaintiffs argue that the various experts testified that the proffered materials were authoritative, the record shows that often the witness merely stated that he recognized an author's name. In addition, counsel's general statement to the court that he wanted Drs. Lichtenstein and Sussman to read from the texts to aid in explaining the pathology of NPH to the jury does not satisfy the requisite specificity needed for a proper offer of proof. (See *Lukas v. Lightfoot* (1985), 131 Ill. App. 3d 566, 476 N.E.2d 1; *People ex rel. Fahner v. Hedrich* (1982), 108 Ill. App. 3d 83, 438 N.E.2d 924.) Thus, even if we were to adopt the Federal rule, the inadequate offers of proof would severely hamper our determination, *e.g.*, as to whether the treatises are reliable authorities.

■■ Plaintiffs also contend that the trial court erred in allowing cross-examination of Dr. Sussman and related comments in closing arguments. The cross-examination referred to an EEG Society's roster which listed Dr. Sussman as a member, but failed to show him as being board-certified, as he claimed; and a Cook County Jury Ver-

dict Reporter listing numerous names of expert witnesses who testified in 1983 and 1984, contrary to Dr. Sussman's statement that only two other doctors in the country would testify in his fields of expertise. The opposing party may cross-examine the expert witness as to his qualifications, but this does not reduce the burden of the proponent of the expert to establish the witness's qualifications. (*People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200; *People v. Park* (1978), 72 Ill. 2d 203, 380 N.E.2d 795.) Notwithstanding the propriety of the cross-examination, any alleged error in the admission of evidence designed to impeach a witness is not reversible error where no prejudice results. (*Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216.) We find that, even if the roster and Verdict Reporter had been used improperly and were not authenticated, no prejudice resulted. Dr. Sussman lent considerable support to plaintiffs' case. He offered detailed technical information and repeatedly displayed his medical expertise to the jury over several days of testimony. The core of his testimony concerned highly technical aspects of neurology. Thus, it is unlikely that the jury gave undue weight to the EEG Society's failure to put an asterisk next to Dr. Sussman's name in its roster, especially where he testified that the same roster erred in spelling his name. In addition, Dr. Sussman's testimony regarding the number of experts in his field who were willing to testify could only have had a minimal effect on his credibility, considering the irrelevance of that particular question to the substantive medical issues being tried.

▮▮ Plaintiffs next contend that the trial court erred in permitting Dr. Duffy to testify that Drs. Davison, Lenardo and Levy concurred with his opinion that Beverly's condition was critical, when Drs. Lenardo and Levy never testified. When plaintiffs called Dr. Duffy as an adverse witness, however, plaintiffs' counsel asked Dr. Duffy about a medical report where he commented, "agree shunt is indicated." Counsel asked, "[W]ith whom did you agree that shunt was indicated?" Dr. Duffy replied that he agreed with Drs. Levy and Davison. Dr. Leonardo is Beverly's family physician. The examination of Dr. Duffy by defense counsel was proper because it merely further explained testimony elicited on examination by plaintiffs and inferences which could be drawn from that testimony.

▮▮ Plaintiffs contend further that several times defense witnesses were improperly permitted to testify regarding the basis of their opinions. Generally, an expert may base an opinion upon specialized knowledge, including facts, data, or opinions contained in a

learned treatise recognized as reliable authority. (*Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779.) In *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, our supreme court adopted Rule 703 of the Federal Rules of Evidence, which provides that an expert may base an opinion or inference upon facts or data perceived by or made known to him at or before the hearing. Such facts or data need not be admissible in evidence if they are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. Such materials include reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140.

▆▆▆ Plaintiffs contend that the trial court erred in permitting Dr. Davison to read verbatim and interpret nurses' notes. Several of the notes concerned Beverly's mental state. For example, Dr. Davison explained that "forgetful, disoriented X3" meant that preoperatively Beverly was forgetful, confused and anxious. Dr. Davison testified that he relied on nurses' notes in evaluating his patients. It is permissible for a doctor to testify about statements made by other medical personnel in reports which the witness relied upon in evaluating the mental condition of a patient. (See *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140; *People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.) Plaintiffs' reliance on *Guerrero v. City of Chicago* (1983), 117 Ill. App. 3d 348, 453 N.E.2d 767, and *Bailey v. City of Chicago* (1983), 116 Ill. App. 3d 862, 452 N.E.2d 680, is misplaced. Unlike the present case, those cases concern testimony regarding nonmedical aspects of hospital records.

▆▆▆ Plaintiffs contend further that the trial court erred in allowing Dr. Davison to read verbatim from his own office notes dated as late as July 10, 1982, which indicated that the etiology of the hydrocephalus was never adequately established and that an obstructive process was considered as a possible cause of Beverly's condition. Plaintiffs argue that the office note is irrelevant to the issue of the competence of Dr. Davison's diagnosis, which was made six months earlier. The rule of past recollection recorded generally requires a showing of no independent recollection. (*Wilsey v. Schlawin* (1976), 35 Ill. App. 3d 892, 342 N.E.2d 417.) Defendants admit that whether or not Dr. Davison had any independent recollection was "not conclusively established in the record." Here, there was no indication that

Dr. Davison lacked even sufficient present recollection of his examination of Beverly in July 1982. The error, however, is not cause for reversal because other competent evidence established that a definitive diagnosis of Beverly's condition was never affirmatively established and that obstructive hydrocephalus was one of several working diagnoses. See *Walters v. Taylor* (1976), 36 Ill. App. 3d 934, 344 N.E.2d 765.

■■■ ■ Plaintiffs also argue that several errors occurred when defense counsel was permitted to cross-examine plaintiffs' experts regarding materials which they reviewed, but upon which they did not rely. Plaintiffs' contentions invoke both the *Wilson v. Clark* rule regarding what an expert may reasonably rely upon as the basis of his opinion and the general principles permitting an expert to be cross-examined in an attempt to probe the strength of his opinion and its basis. The precise scope of cross-examination rests within the discretion of the trial court. (*Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216.) Counsel must be given the widest latitude during cross-examination to demonstrate any interest, bias, or motive of the expert witness to testify, and to test his accuracy, recollection and credibility. (*Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216.) Facts, data, and opinions which form the basis of the expert's opinion but which are not disclosed on direct examination may be developed on cross-examination. There is a heavy burden on the cross-examiner to expose any weakness inherent in the expert's opinion, but this burden is not excessive in light of Illinois' extensive pretrial discovery procedures. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981) 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140.) Great liberality should be allowed the expert in determining the basis of his opinions under Rule 703, and the weight to be given an opinion is for the trier of fact. (*Melecosky v. McCarthy Brothers Co.* (1986), 115 Ill. 2d 209, 503 N.E.2d 355.) The cross-examiner is not limited to facts which find support in the record. The trial court's determination regarding the scope of cross-examination will not be reversed in absence of an abuse of that discretion. (*City of Chicago v. Merton Realty* (1981), 99 Ill. App. 3d 101, 424 N.E.2d 1326.) Plaintiffs complain that the trial court erred in permitting Dr. Sussman to be cross-examined regarding a June 1981 CT scan report because Dr. Sussman did not indicate that he relied on the report in reaching his opinion. Dr. Sussman testified, however, that he read all the reports interpreting the various CT scans, including the June 1981 scan and report, and that some of the reports contained interpretations similar to his own. An expert who

has based his opinion on a report does not have to agree with the entire report. (*Gordon v. Chicago Transit Authority* (1984), 128 Ill. App. 3d 493, 470 N.E.2d 1163.) Thus, while Dr. Sussman might rely on the actual pictures taken by the scan or the computer information adduced in reaching his opinion, he need not agree with the conclusion of the neuroradiologist. In addition, it is not error to question an expert regarding the basis of his opinion, which may include reports or medical tests performed by others. See *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 106 S. Ct. 140.

Similarly, it was not error to allow Dr. Sussman to be cross-examined in regard to whether Drs. McLone, D'Angelo and Ramsey found the fourth ventricle larger in January 1982 than it was in June 1981. Dr. Sussman testified that he read the depositions of other witnesses and had read Dr. Ramsey's report. It is not error to permit an expert to testify regarding reports or medical tests performed by other doctors, and which he examined in reaching his own opinion. See *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 106 S. Ct. 140.

██ Plaintiffs next contend that the trial court erred in allowing Dr. Pierini to be cross-examined on a medical report of Dr. Bauer, a neurosurgeon, regarding whether the shunt was functioning or could cause a seizure. Dr. Pierini testified that he asked Dr. Bauer to examine Beverly and that he relied on Dr. Bauer's opinion in his further treatment of Beverly. An expert can testify not only that he relied upon medical records in forming his opinion and treating the patient, but he can also testify as to the contents of those records. (*People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171; *Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216 (and cases cited therein).) Reports and opinions from other doctors are considered facts or data reasonably relied upon by experts in the field. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 106 S. Ct. 140.) No error occurred in connection with the cross-examination of Dr. Pierini.

■██ Plaintiffs also maintain that the trial court erred in allowing the cross-examination of Dr. Lichtenstein on the issue of the care rendered to Beverly by defendants. Dr. Lichtenstein testified for plaintiffs that prior to surgery Beverly had become critically ill and the shunt operation was done to relieve this condition. On cross-examination Dr. Lichtenstein was asked whether, based on his reading of the medical record and depositions, shunting was an acceptable procedure for Beverly. Because this tends to explain, qualify, modify, discredit or

destroy the testimony on direct examination regarding whether a shunt could relieve the critical condition, we find that the cross-examination did not go beyond the scope of direct examination. See *Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216.

▮▮ Plaintiffs argue that the trial court improperly limited their cross-examination of Dr. Davison regarding Beverly's urinary problems following surgery. Plaintiffs reason that proof of health before an injury and a change immediately thereafter tend to establish that the injury caused the impaired condition. Liability, however, must be based on a showing of proximate cause which establishes a reasonable certainty that defendants' acts caused the injury. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *Ortiz v. City of Chicago* (1979), 79 Ill. App. 3d 902, 398 N.E.2d 1007.) Dr. Sussman testified that postoperatively Beverly had a urinary frequency problem which was completely unrelated to her neurological dysfunction. Defendants' experts agreed. The trial court did not err in limiting cross-examination of Dr. Davison on this issue in light of the absence of any evidence establishing causation.

▮▮ Plaintiffs next contend that the trial court erred in permitting Dr. Davison to answer a question regarding whether a home visit by a laboratory implied that preoperatively Beverly was incapacitated. A laboratory bill dated January 4, 1982, shows a fee for a blood test plus a $25 charge for a house call. Dr. Davison stated that Beverly may have been too incapacitated to go to the laboratory for the test. This was also argued in closing. We do not believe that under the rules set forth in *Wilson v. Clark* this is the type of trustworthy evidence which a physician would typically rely upon to form an opinion regarding a patient's preoperative condition. Error in the admission or exclusion of evidence is harmless, however, if the facts involved are established by other competent evidence. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, N.E.2d 1322.) Dr. Davison's testimony regarding the mental condition of Beverly prior to surgery was cumulative of that offered by Boltz and of Dr. Davison's own testimony regarding his preoperative examination of Beverly. Thus, any error was harmless.

Plaintiffs accuse defendants of perjury and request a new trial on that basis. Plaintiffs state that both defendants testified that Beverly's "intellectual capacity was the same at trial as it was preoperatively." Plaintiffs argue that "defendants could only be lying about her mental condition before surgery." Post-operatively, plaintiffs point to the fact that on a videotape showing Beverly at home, she raves, and repeatedly makes emotional outbursts. Preoperatively, the nurses'

674

notes refer only to memory difficulties and dizziness, and the testimony of Reinecke, Boltz, and Capraro corroborate the substance of the nurses' notes. Plaintiffs state, "Of course, the motive for the testimony was to allow the jury to rationalize: if she was as bad before surgery as she was in court, what harm did the surgery cause, she was a hopeless case!"

▪▪▪ Initially we note that accusing an opposing party of perjury is extremely serious and should not be made lightly, notwithstanding the adversarial nature of litigation. As to plaintiffs' substantive points, we find no evidence that defendants perjured themselves. Defendants never testified that Beverly's mental or intellectual condition was "the same at trial as it was preoperatively." On the contrary, Dr. Davison stated he could not offer an opinion about Beverly's condition at trial because he had not recently examined her. Dr. Duffy was never asked to make such a comparison. Moreover, in the face of Dr. Sussman's testimony on behalf of plaintiffs that Beverly was the same or slightly better after surgery, it makes little sense to accuse defendants of "lying about her mental condition before surgery" merely because defendants agreed with plaintiffs' expert. Additionally, plaintiffs' comparison of the post-operative videotape depicting Beverly's emotional outbursts, and the nurses' preoperative notes which refer only to memory problems and dizziness, along with the testimony of Beverly's family and friends, does not conclusively establish a significant difference in her mentation before and after surgery. Furthermore, some evidence suggests that Beverly's mental condition deteriorated after the 1983 seizure episode, which was unrelated to the 1982 shunt operation.

▪▪▪ Plaintiffs next contend that the trial court erred in holding that a surgeon's deviation from the shunt manufacturer's directions is not substantive evidence and erred in striking the portion of plaintiffs' closing argument on that point. Dr. Duffy testified that neurosurgeons would not rely on such package inserts; that various manufacturers showed different locations for placement of the hole; and that the illustration was shown of an infant, not an adult. Dr. Duffy testified regarding the difference between placing a burr hole for an infant and an adult. Moreover, there was no testimony that this was the shunt used on Beverly. In addition, the evidence established that no single method was universally accepted as to the proper placement of the burr hole. Plaintiffs failed to establish that the manufacturer's illustration was a standard against which defendants' conduct was to be measured. (See *Young v. Cerniak* (1984), 126 Ill. App. 3d 952, 467 N.E.2d 1045, distinguishing *Ohligschlager v. Proctor Community Hos-*

*pital* (1973), 55 Ill. 2d 411, 303 N.E.2d 392 (where drug manufacturer's recommendation included warnings of undesirable result should a physician deviate from the precise instructions).) The trial court properly sustained objections to plaintiffs' comments to the jury that the manufacturer's pamphlet shows "where the burr hole should be made."

■■■ Plaintiffs argue that the trial court erroneously prohibited plaintiffs from commenting on defendants' failure to produce Dr. Lenardo, Beverly's treating physician, as a witness. The trial court properly ruled on this issue where plaintiffs failed to show that Dr. Lenardo was under defendants' control and was not equally available to both sides. See *Foerster v. Illinois Bell Telephone Co.* (1974), 20 Ill. App. 3d 656, 315 N.E.2d 63.

■■■ Plaintiffs next claim that cross-examination of defendants resulted in "defendants agreeing or admitting that their surgical procedure and diagnosis made was not supported by criteria recommended by authorities on the subject of NPH." This charge is unsupported by the record. Plaintiffs comment, however, that "[s]o many times when plaintiffs had an opportunity to add credence to Dr. Sussman, *under law*, the trial court would pull a rug from under their case" by ruling that medical texts and treatises are to be used only for impeachment purposes. The trial court ruled correctly and properly restricted plaintiffs' closing arguments on this point. See *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.

■■■ Plaintiffs finally argue that the trial court erroneously ruled on the weight to be accorded the experts' testimony. Plaintiffs' counsel invited the jury to view the skull X ray and CT scans to independently determine whether the shunt was within the ventricular system or internal capsule; and determine whether the ventricles had become significantly enlarged in the six months prior to surgery. A jury is not bound to accept the opinion of an expert on an ultimate issue. (*Harris v. Bethlehem Steel Corp.* (1984), 124 Ill. App. 3d 449, 464 N.E.2d 634.) A jury is free to disregard an expert witness's conclusions of fact. (*Society of Mount Carmel v. Fox* (1980), 90 Ill. App. 3d 537, 413 N.E.2d 480.) The weight to be given to expert testimony is for the trier of fact. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.) In the present case, however, the medical issues required expert testimony because they were beyond the understanding of a lay person. (See *Walski v. Tiesenga.* (1978), 72 Ill. 2d 249, 381 N.E.2d 279.) The trial court could properly restrict plaintiffs' comments which might suggest to the jury that it could disregard all of the witnesses' testimony and independently interpret the X rays and CT scans.

In conclusion, while there may have been minor improprieties by both sides, taken as a whole this lengthy, complex trial was conducted fairly, and we will not intrude on the jury's deliberated verdict. See *Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E.2d 779.

For the foregoing reasons, the judgment of the circuit court of Cook County in favor of defendants is affirmed.

Judgment affirmed.

WHITE and FREEMAN, JJ., concur.